**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| OLIN CORPORATION,<br><br>               Plaintiff,<br><br>v.<br><br>INTERNATIONAL UNION OF<br>OPERATING ENGINEERS, LOCAL 564,<br><br>          Defendant. | Civil Action No. |

## ORIGINAL COMPLAINT

### INTRODUCTION

1.     This is an action to vacate the arbitration award issued on January 15, 2024 (the "Award") by Arbitrator Angela D. McKee in the matter between Plaintiff Olin Corporation ("Olin" or the "Company") and Defendant International Union of Operating Engineers, Local 351 (the "Union" or "Local 351") regarding a contractual grievance challenging the Company's termination of Robert Brown for gross dishonesty that obstructed an investigation at Olin's chlorine plant in Freeport, Texas.[1]

2.     This is a classic illustration of how an arbitrator's personal beliefs ignored an unambiguous labor agreement and fashioned a legal standard that makes it nearly impossible for employers to police the integrity of their workplace investigations and

---

[1] A true and correct copy of the Award is attached hereto as Exhibit 1.

ensure that co-workers can trust one another when working with deadly chemicals.  The Award displaces a bedrock jurisdictional requirement of the collective bargaining agreement between Olin and the Union (the "CBA"): that the "arbitrator in no way shall be permitted to add to, subtract from, or modify in any way the terms of this Agreement or have any authority in making of a new Agreement."[2]  In place of that foundational precept, relying on her own "beliefs," the Arbitrator adopted her "personal position" that could not possibly be gleaned from the CBA and that runs roughshod over basic principles of due process long applied by the Fifth Circuit in resolving challenges to employee terminations. Indeed, the Arbitrator's award never even references the CBA. Far from a reasoned analysis of the CBA, the Arbitrator invented her own brand of industrial justice that has no basis in the parties' labor agreement or even established legal principles in the Fifth Circuit.

3.     The facts underlying the Award are undisputed, and Olin does not challenge the Arbitrator's factual findings.   The Award arose from the termination of Robert Brown, an operator at a plant that manufactures highly toxic, yet critically important chlorine gas. Brown was accused of making derogatory and sexist remarks toward his female co-workers. Olin investigated these claims and suspended Brown as a result. After the investigation, it was revealed that the union steward who sat in on the investigatory interviews of Brown's co-workers, leaked the details of those interviews to Brown who subsequently shared them with others. When Brown's co-workers discovered this, they complained that Brown and the union steward had breached their trust by sharing

---

[2] A true and correct copy of the CBA is attached hereto as Exhibit 2.

confidential details of the investigation.

4.     There is no dispute that Brown then lied to his fellow operators in an attempt to cover up his betrayal of their trust.  Specifically, Brown and the union steward led an operator-only meeting at which the steward threatened the operators "with dirt" he had on them, calling them all "m-effers."   Brown followed closely behind, pretending the steward's disclosures never happened and exhorting his co-workers to accept a new version of events in which he sought to deflect accountability and blame by falsely accusing Olin's human resources manager of disclosing the details of what they had told Olin in confidence when interviewed as part of the investigation into his misconduct.

5.     Brown's misdeeds did not end there.  When the company investigated the misconduct, Brown doubled down.  The company appointed new independent investigators who interviewed at least a half dozen witnesses, including Brown and his fellow operators. When the investigators asked Brown whether the union steward shared private information he learned when sitting in on the interviews in his role as union steward, Brown denied it. When the investigators inquired about conversations Brown had with co-workers about helping the union steward and "flipping" the blame for the disclosures to others, Brown denied that too.  And when the investigators asked Brown whether he told co-workers that the union steward disclosed their information from investigations, Brown flatly said no.

6.     All these denials may have successfully obstructed Olin's investigation.  But Brown was not the only witness to these events.  His co-workers told a dramatically different story, corroborated by their credited testimony at the hearing.  Long before Brown decided to shift the blame for the union steward's disclosures, Brown told one of his co-

3

workers about all the information the steward passed on to him about private investigatory interviews.  That co-worker reported it.  Brown's co-workers also remembered that Brown never objected and even nodded when allegations about the union steward's disclosures came to be known.  They reported that too.  And when Brown plotted in the men's changeroom to lie about the union steward's disclosures, another operator overheard it and confronted them.  The operator reported that changeroom conversation.  Finally, when Brown told a made-up story that the plant's human resources manager, not the union steward, disclosed private information, the operators heard it and reported it too.

7.      Arbitrator McKee accepted all these facts in her findings and did not question the integrity of Olin's investigation.  In fact, she expressly found that "proof of [Brown's] misconduct is undisputed" and that the Company offered "more than sufficient evidence to show that [Brown] was dishonest during the investigation."  According to Arbitrator McKee, Brown's lies were particularly egregious because the "people who provided the information to show that [Brown] was dishonest were his fellow bargaining unit members, something that is unusual."  For that reason, and in the high-risk environment where they work, it was "understandable" to Arbitrator McKee "that they do not trust [Brown] and do not want him to return to work."  Arbitrator McKee even opined that such dishonesty "is a serious violation and would support at least one step of discipline, which in this case would have been termination."

8.      Despite these findings, including the egregiousness of Brown's misconduct, Arbitrator McKee inexplicably ordered him back to work.  Arbitrator McKee offered only one explanation: Brown was not "given the opportunity" to address "his dishonesty during

4

the [union steward] investigation."   Acknowledging the thoroughness of Olin's investigation, Arbitrator McKee nevertheless held that Olin was required to apply a mere "formality" and ask Brown, "Are you sure you are telling the truth about that?"

9.      Arbitrator McKee did not base this requirement on the CBA.  Her Award does not mention the CBA at all, much less interpret or construe it.  Instead, Arbitrator McKee adopted her concededly "*personal* position" and made it the law of the shop. Arbitrator McKee explained that she does not "hold employers to a particularly high standard of giving employees their 'day in court' before discipline."  She further explained that she does not "believe it has to be a formal process."  She remarked that she "would be satisfied that [Brown] received an opportunity to tell his story" if only Olin had asked him whether he was lying.  At no point did Arbitrator McKee state that *the CBA* that she was obligated to apply required any of these things.  Rather, her reasoning was based on her own "personal position" and "belief."

10.      Arbitrator McKee's own findings leave no dispute that Brown's misdeeds would have warranted termination regardless of his response to the question, "Are you lying?"  Arbitrator McKee even "surmise[d]" that had Olin asked Brown whether he was lying, he "would have just denied lying."  That denial alone, according to the Arbitrator, would have been grounds for termination.  Yet Arbitrator McKee inexplicably ignored this settled law in favor of her own "personal position" -- little more than a "formality," in her assessment – that Olin was required to ask a liar whether he was lying in order to terminate Brown for lies that she found he had told.

11.      The Award unnecessarily upsets the most rudimentary requirement that the

LMRA imposes on all arbitrators charged with resolving disputes under labor agreements, namely, that arbitrators must act within their contractual authority, and they must issue awards that "draw their essence" from the CBA.  The Arbitrator did neither here.

12.     First, Arbitrator McKee violated the express terms of the CBA by exceeding the jurisdiction and authority the parties agreed to provide her.  Specifically, Arbitrator McKee ignored the CBA language granting Olin the right to promulgate, maintain, and enforce work rules; conduct investigations; and terminate employees for violation of those rules and for obstructing the integrity of investigations.  Instead of applying or interpreting those CBA provisions, Arbitrator McKee solely relied on her "personal position" and adopted a standard that she conceded was merely a "formality."  Through her Award, the Arbitrator announced to all employers that, regardless of the strictures of their collective bargaining agreements, at all times, they must ask employees under investigation, "Are you lying?"  But that requirement has no basis in Olin's CBA.  Nor did the Arbitrator cite any provision of the CBA to support her conclusion.

13.     Second, in addition to exceeding the authority delegated to her under the CBA, Arbitrator McKee issued an Award that fails to draw its essence from the CBA. Indeed, the Award is bereft of a single mention of the CBA or any discussion or any of its provisions, is concededly based on the Arbitrator's "personal position," and could not possibly be described as interpreting or construing any CBA provision.  Moreover, the Award ignores settled Fifth Circuit precedent that an employer may defend a denial of due process with proof that the employee would in any event have been terminated.  Arbitrator McKee's own findings leave no dispute that Brown's misdeeds would have warranted

6

termination regardless of his response to the question, "Are you lying?"—and so the Award could not possibly draw its essence from the CBA.

14.     In ignoring the language of the CBA and exceeding the express and limited authority granted to her by the parties, Arbitrator McKee improperly dispensed her own brand of industrial justice.  The Award therefore violates 29 U.S.C. § 185 and must be vacated.

## JURISDICTION AND VENUE

15.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and Section 301 of the Labor-Management Relations Act, as amended (the "LMRA"), 29 U.S.C. § 185.

16.     The Court has the authority to grant the requested declaratory and injunctive relief under the LMRA, 29 U.S.C. § 185 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

17.     Venue is proper in this district under 29 U.S.C. §§ 185(a) and (c) and 28 U.S.C. § 1391(e)(1).  The arbitration upon which the Award was issued occurred in this judicial district; Plaintiff Olin operates a chlorine plant where the underlying events occurred in this judicial district; and Defendant Local 564 maintains its principal office and is engaged in representing or acting for employee members in this judicial district.

## PARTIES

18.     Plaintiff Olin is a corporation operating in the State of Texas.  Olin is engaged in the business of manufacturing and distributing chemical products and ammunitions. Olin manufactures chlorine products at its facility in Freeport, Texas.  Olin is an employer

within the meaning of 29 U.S.C. § 152(2).

19.     Defendant Local 564 is a labor organization within the meaning of 29 U.S.C. § 152(5) and is the collective bargaining representative of operators in the cell services department at Olin's chlorine plant in Freeport, Texas.  The Union's agents are engaged in representing and acting for its members, who are and have been Olin employees in an industry affecting commerce within the meaning of 29 U.S.C. § 185.  The Union's primary place of business is 2120 North Brazosport Boulevard, Richwood, Texas 77531.

## BACKGROUND

### A. The Cell Services Bargaining Unit

20.     At all material times, the CBA negotiated and agreed between Olin and the Union covered the terms and conditions of employment of operators employed in the cell services department at Olin's chlorine plant in Freeport, Texas.

21.     The cell services department employs a staff of operators who perform maintenance work on large, energized machines called diaphragms and electrolyzers that are used to produce chlorine gas.

22.     Chlorine gas serves an essential societal purpose: it is used to treat drinking water and kill bacteria, viruses, and other microorganisms that cause disease and illness around the world.  Chlorine is also a hazardous chemical.  Exposure to certain concentrated amounts could put everyone in its path at risk of death.  That is especially true in the environment where cell services operators work.  In their work environment, the operators maintain and repair energized machinery full of concentrations of these deadly chemicals.  A single misstep could expose all the operators and other workers in the vicinity to a fatal

dosage of chlorine.  For this reason, Olin considered trust among the operators a paramount and essential requirement of the job.

**B.  Olin's Right to Maintain and Enforce Its Work Rules and Code of Conduct**

23.    The Union recognized the seriousness of trust and reliability in the workplace.  In Article XIV of the CBA, the Union agreed that the Company and Union would "perform [their] proper function in promoting and maintaining safe working conditions and good housekeeping practices."

24.    To ensure safe working conditions and smooth operations in this high-risk environment, the Union further agreed that Olin had the right to maintain and enforce workplace rules.  Article XIII of the CBA specifically provides that "fair treatment, good service, and due diligence in the observance of the rules as promulgated by the Company, are essential to the maintenance of satisfactory working conditions."

25.    Based on this CBA authority, Olin promulgated and maintained Work Rules and a Code of Conduct to promote an environment of trust—what the Company considers "a basic work expectation that we would act with integrity and be honest in the workplace."

26.    Olin Work Rule A14 prohibits the "[f]ailure to fully and honestly disclose any and all information relating to a matter under investigation."  Employees who violate this rule "will be subject to corrective discipline up to and including discharge."  The Company considers violations of this rule to be a "serious infraction that could lead to termination based on one occurrence."

27.    The Work Rules also prohibit violations of Olin's Code of Conduct.  The Code of Conduct mandates all employees to "be truthful in [their] communications,

whether verbal or written, and in [their] actions," and "never lie by making false statements or leaving out the full details."  Therefore, the Code of Conduct requires all employees "to cooperate fully with any investigation," to "always provide truthful and complete information," and to keep private matters private.  The Code also strictly prohibits employees from "threatening, harassing, or discriminating" or otherwise "retaliating" against their co-workers, including in any Company investigations.  The Code thus "[p]rotects confidentiality" in investigations, disclosing the contents of an investigation "only on a strict 'need to know' basis."

28.    When employees in the bargaining unit are suspected of violating the Work Rules and Code of Conduct, the CBA authorizes Olin to investigate their conduct and discipline them.  Specifically, Article XVIII of the CBA recognizes Olin's "intent to administer discipline and conduct investigations which could lead to discipline in an expedient manner."  In the same regard, Article XXXII of the CBA gives Olin the "right to discipline and discharge; require employees to comply with Company policies, rules, procedures, regulations and practices; to require interactive cooperation with other employees and to refrain from engaging in any type of insubordination or misconduct."  For "[s]evere violations," including "violations of the Respect and Responsibility policy and the Minimum Standards of Conduct," the CBA empowered Olin to terminate an offending employee.  CBA, Art. XXXII.

29.    There is no dispute that members of the cell services bargaining unit, including Brown himself, were trained in and on notice of these rules and CBA provisions, including the possibility of termination for violating them.

### C.  The CBA's Grievance and Arbitration Procedures

30.     In the event the Union challenged Olin's disciplinary decisions, the CBA provides an informal procedure for resolving disputes over the appropriate application of CBA requirements.

31.     Where the Union and the Company cannot agree to resolve their differences informally, Article XIX of the CBA provides a limited arbitration procedure for settling on the correct application of the terms of the CBA.

32.     Although the Union and Olin have agreed to arbitrate disputes that they could not resolve on their own, they expressly limited the arbitrator's authority.  Specifically, through the CBA, the Union and Olin have agreed that "[t]he arbitrator *in no way shall be permitted to add to, subtract from, or modify in any way the terms of th[e CBA] or have any authority in making of a new Agreement*."  CBA, Art. XIX (emphasis added). Moreover, Olin and the Union have agreed that "[t]he Arbitrator's decision shall be *within the scope and terms of th[e CBA] and shall not change any of its terms or conditions*." *Id.* (emphasis added).

### D.  The Union's Grievance

33.     On January 23, 2023, the Union initiated a grievance on behalf of Robert Brown, an operator in cell services at the Freeport plant.  Olin had terminated Brown for using his relationship with a former union steward to collect confidential information from an investigation conducted by Olin into his own misconduct and then lying when his fellow operators complained that he breached their privacy and trust.

34.     Olin believed termination was warranted due to the seriousness of Brown's

violations and also because his misconduct was only the last chapter in a series of policy violations, including a pattern of derogatory and sexist remarks toward his female co-workers for which he was recently suspended. The Union's grievance nevertheless stated, "The Union contends this is unjust and requests the company to put Mr. Brown back to work."

### E. Arbitration Hearing

35.     Because the Union and Olin could not agree to resolve the grievance on their own, the Union demanded arbitration. The Union and Olin then agreed to submit the grievance to Arbitrator McKee under the limited authority provided to her in Article XIX of the CBA.

36.     On September 29, 2023, Arbitrator McKee conducted a day-long hearing.

37.     Olin called five witnesses, including two of Brown's fellow bargaining unit members, and offered documentary evidence in support of the Company's decision to terminate Brown.

38.     The Union did not offer any evidence to rebut the witnesses who testified about what they observed Brown say or do.

### F. Arbitrator McKee's Findings of Fact

39.     The Arbitrator's findings of fact are undisputed.

40.     Brown worked for the Company for five years in its Freeport chlorine plant. In November 2022, Brown received a five-day suspension without pay for making inappropriate comments about female co-workers. The Union did not grieve the suspension. In addition to the suspension, Brown was required to apologize privately to the

12

female co-workers and publicly to all the members of the cell services unit where he worked.

41.     During his private apology to one of the female co-workers, Brown told her that he learned details of the investigation into the conduct underlying his suspension from the union steward at the time.  When other bargaining unit operators learned of this, they were alarmed and questioned the union steward's integrity to act on their behalf.

42.     Shortly thereafter, the operators held an operators-only meeting (i.e., a meeting outside the presence of management) to discuss the matter while the union steward was on vacation.  During the meeting, one bargaining unit operator told the other operators that the union steward had fed information to Brown about what happened during the investigation underlying Brown's suspension.  Upon hearing the operator say this, Brown nodded his head and did not say anything to dispute it.  Later in the meeting, the operator heard Brown muttering that the union steward had told him information from the investigatory interviews.

43.     Immediately after this meeting, another operator told Brown in the men's change room that Brown had put the union steward in jeopardy and that Brown should have kept the information the steward gave him to himself.  Brown responded that it was not his fault, but the fault of the female co-worker to whom he had been ordered to apologize.

44.     The operators held another operator-only meeting after the union steward returned from vacation, this time to confront the steward about the allegations that he had shared information about an investigation and to vote on whether to remove him as steward. During this meeting, the steward denied sharing details of the investigation and Brown

backed him up, saying that his female co-worker was lying, and it was the Company's human resources manager who shared information about the investigation with him, not the union steward.  The steward told the operators, "I've got dirt on all of you m-effers" and "I'll put cases on all of you."

45.     The following day, Brown repeated his assertion that his female co-worker was lying, and it was the Company's human resources manager who shared information about the investigation with him, not the union steward.

46.     The operators—all members of the bargaining unit—reported what happened to management. Management then commenced an investigation into the union steward's conduct.  The investigation was conducted by independent human resources officials who did not oversee the cell services department.  This staffing decision was intentional: the investigators were selected because they did not have prior history with any of the witnesses.

47.     The investigators kept detailed notes of the witness interviews.   They interviewed a total of 13 witnesses.  A bargaining unit member was permitted to sit in on interviews with other bargaining unit members.

48.     On December 6, 2022, the investigators interviewed Brown.  During his interview, Brown denied telling his female co-worker that the union steward had shared details of the suspension investigation with Brown.  Brown said that the union steward never shared details of that investigation with him.   Brown also denied having a conversation in the men's room about protecting the union steward and his female co-worker allegedly lying.

14

49.     The investigators concluded that Brown was untruthful during the investigation, which is a violation of the Company's Group A Work Rules and Code of Conduct.  Specifically, the investigators found that Brown was dishonest about (1) telling his female co-worker that the union steward had shared details of the suspension investigation with him; (2) the conversation in the men's room; (3) nodding in agreement during the first operators' meeting when another bargaining unit operator said the union steward had shared details of the investigation with Brown; and (4) recanting what Brown originally said about the union steward and saying instead that it was Olin's human resource manager who shared information about the investigation. The investigators shared these findings with the Company and recommended a step of discipline – which, as Brown was already at the penultimate step of discipline after his November 2022 suspension, put him at termination.

50.     On January 16, 2023, Olin issued Brown a termination letter stating:

"The purpose of this letter is to inform you that your employment is being terminated, effective today January 16, 2023, for making a false statement about your actions in the course of an investigation conducted by Human Resources on December 6 and 7. Your actions violated Olin's Code of Conduct and Olin Work Rules. Additionally, your active discipline record reflected a third step of discipline at the time."

**G. Arbitrator McKee's Award**

51.      On January 15, 2024, Arbitrator McKee issued the Award, sustaining the grievance and ordering Brown's reinstatement.

52.     Arbitrator McKee found that Brown's misconduct is undisputed.

53.     Arbitrator McKee also found that while Olin conducted an investigation of

the union steward, it was permitted to expand its investigation based on new facts discovered during the investigation.  For that reason, according to Arbitrator McKee, Olin was not obligated to conduct an entirely new investigation of Brown: "it was free, for example, to use information gleaned from witness interviews in the [union steward] investigation to support its case against [Brown] once he became the target of an investigation himself.  The Company did not need to announce a new investigation and re-interview the same witnesses."

54.     Arbitrator McKee also found that the Company need not have advised Brown of the specific charges against him, meaning the specific rules he had broken, before terminating him.

55.     Arbitrator McKee held that if the Company conducts an investigation into one employee, and during the course of that investigation learns about potential misconduct by another employee, it is not obligated to notify the second employee that he or she is now part of the investigation; however, the Company is obligated to ask the second employee questions about any misconduct he or she is alleged to have committed, and allow the second employee to answer those factual allegations.

56.     Arbitrator McKee found that Brown was indeed "asked about his conversation with [his female co-worker], his statements about [the union steward] leaking details of the suspension investigation to him, and his conspiring with [the union steward] to deny his previous statements and place blame on [his female co-worker and the Company's human resources manager]."  Arbitrator McKee found that the Company "has offered more than sufficient evidence to show that [Brown] was dishonest during the

investigation," and dishonesty "is a serious violation and would support at least one step of discipline, which in this case would have been termination." Arbitrator McKee even recognized that the "people who provided the information to show that [Brown] was dishonest were his fellow bargaining unit members, something that is unusual," and it is "understandable that they do not trust [Brown] and do not want him to return to work."

57.     Despite these factual findings, Arbitrator McKee held that her "personal position is that, in private sector employment, although due process is somewhat flexible, giving the employee an opportunity to tell his or her side of the story is the bare minimum." Arbitrator McKee found that Brown was thoroughly interviewed during the investigation. But applying her "personal" standard to the factual findings of the case, Arbitrator McKee sustained the Union's grievance solely because the Company did not ask the following question: "Are you sure you are telling the truth about that? Several other people have told us the opposite." Acknowledging that her version of "due process is in many ways a formality," Arbitrator McKee "surmised" that Brown "would have just denied lying" had he been asked whether he was lying during the investigation. Arbitrator McKee nevertheless ordered that Brown "be put back to work."

58.     In the Award, Arbitrator McKee ignored the language in Article XII, Article XVIII, and XXXII of the CBA, which grants Olin the right to promulgate rules and discipline employees for violation of those rules. There is no dispute that Olin promulgated such rules in its Work Rules and Code of Conduct. Nor is there any dispute that Brown violated those rules or that his violations warranted termination. But in direct conflict with those undisputed facts—indeed the Arbitrator's own factual findings—and those CBA

rights, Arbitrator McKee applied her "personal position" to the Union's grievance.

59.     Arbitrator McKee did not once refer to the CBA, much less cite or interpret a provision of the CBA as basis for her Award.  Nor did Arbitrator McKee cite any authority of any kind.  Instead, the Award announced her "personal position" based on what *she* "believes" and the standards to which *she* "holds employers."

## COUNT I: Vacatur of Arbitration Award under 29 U.S.C. § 185

60.     Olin repeats and realleges the allegations made in paragraph 1 through 59 above as if fully set forth herein.

61.     Article XIII of the CBA is unambiguous, and expressly provides that "fair treatment, good service, and due diligence in observance of the rules as promulgated by the Company, are essential to the maintenance of satisfactory working conditions."

62.     Based on this authority, Olin promulgated and maintained Work Rules that provide, "[f]ailure to fully and honestly disclose any and all information related to a matter under investigation" will be "subject to corrective discipline up to and including discharge."  Olin also promulgated and maintained its Code of Conduct that mandates all employees to "be truthful in [their] communications, whether verbal or written, and in [their] actions," and "never lie by making false statements or leaving out the full details."

63.     Article XVIII of the CBA is similarly unambiguous in its recognition of Olin's right to "administer discipline and conduct investigations which could lead to discipline in an expedient manner."  In this regard, Article XXXII of the CBA gives Olin the "right to discipline and discharge; require employees to comply with Company policies, rules, procedures, regulations and practices; to require interactive cooperation with other

employees and to refrain from engaging in any type of insubordination or misconduct."
For "[s]evere violations," like the violations Arbitrator McKee found against Brown,
Article XXXII empowered Olin to terminate employees without regard to progressive
discipline.

64.     Arbitrator McKee did not find—nor does there exist—any contractual
limitation on this CBA authority.  More fundamentally, Arbitrator McKee did not find *any*
contractual requirement that Olin ask Brown, "Are you sure you are telling the truth about
that?"—despite the Arbitrator's undisputed factual finding that Brown was in fact lying
and had committed serious violations of Olin's rules, which warranted termination.
Instead, Arbitrator McKee applied her "personal position" to these facts and adopted a
standard that required Olin to ask Brown whether he was lying as a mere "formality."

65.     By sustaining the grievance based on her "personal position," Arbitrator
McKee added an extra-contractual condition to Olin's right to promulgate, maintain, and
enforce rules regarding investigations.  This condition violated the plain language of Article
XIX of the CBA that "[t]he arbitrator in no way shall be permitted to add to, subtract from,
or modify in any way the terms of th[e CBA] or have any authority in making of a new
Agreement."  For this reason, Arbitrator McKee exceeded her authority under the CBA in
violation of 29 U.S.C. § 185.

66.     Arbitrator McKee's Award also failed to interpret or construe the CBA at all.
Instead, Arbitrator McKee dispensed her own brand of industrial justice by sustaining the
grievance concededly based on her "personal position."  The Award is missing any citation
or reference to the CBA whatsoever, much less a reasoned discussion or interpretation of

19

CBA terms upon which the Award could possibly be based.  For this reason, the Award failed to draw its essence from the CBA in violation of 29 U.S.C. § 185.

67.    There is also no basis for the Award under the CBA.  Because the Arbitrator found that "the proof of [Brown's] misconduct is undisputed" and that Brown "was dishonest during the investigation," there can be no dispute that Brown would have been terminated regardless of whether Olin had satisfied the "formality" of asking Brown whether he was lying—a formality found nowhere in the CBA and one that Arbitrator McKee described as her "personal position."  It is settled Fifth Circuit precedent that, even where such a requirement exists in a CBA (and none exists here), an employer may defend a denial of due process with proof that the employee would in any event have been terminated.  Since the Arbitrator's own findings leave no dispute that Brown would have been terminated, the Award could not possibly draw its essence from the CBA.

68.    Because the Award fails to draw its essence from the CBA, and because Arbitrator McKee exceeded her authority under the CBA, Olin has been injured and vacatur of the Award is proper.

## RELIEF SOUGHT

WHEREFORE, Olin prays for judgment against Defendant as follows:

a.  For an Order vacating in total the Award dated January 15, 2024;

b.  For an Order denying the Union's grievance against Olin; and

c.  For an Order granting such other and further relief as may be necessary and appropriate.

20

Dated:  March 6, 2024                    Respectfully submitted,

                                      /s/ *Brian G. Patterson*

Brian G. Patterson
  Texas Bar No. 24042974
Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street, 44th Floor
Houston, TX 77002
Telephone: (713) 220-5800
Facsimile: (713) 236-0822
bpatterson@akingump.com

Robert G. Lian, Jr.
  D.C. Bar No. 446313 (*pro hac vice* to be filed)
James C. Crowley
  D.C. Bar No. 208946 (*pro hac vice* to be filed)
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
blian@akingump.com
jcrowley@akingump.com

*Counsel to Plaintiff Olin Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2024, the forgoing document was electronically filed with the Clerk of Court utilizing the ECF system, and Defendant International Union of Operating Engineers, Local 564 shall be duly served.

*/s/ Brian G. Patterson*
Brian G. Patterson
  Texas Bar No. 24042974
Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street, 44th Floor
Houston, TX 77002
Telephone: (713) 220-5800
Facsimile: (713) 236-0822
bpatterson@akingump.com

# Exhibit  1

**IN THE MATTER BETWEEN**

| | | |
|---|---|---|
| **OLIN CORPORATION,** | § | *Grievant: Robert Brown* |
| *Company,* | § | *Termination* |
| | § | |
| **and** | § | **FMCS Case No. 230522-06316** |
| | § | |
| **INTERNATIONAL UNION OF** | § | |
| **OPERATING ENGINEERS,** | § | |
| **Local 564,** | § | **Angela D. McKee, Arbitrator** |
| *Union* | § | |

This matter was heard before Angela D. McKee, on September 29, 2023, in Lake Jackson, TX. The parties had full and fair opportunity to present evidence and witness testimony, which was transcribed by a certified court reporter. The parties submitted written closing briefs dated December 22, 2023, at which time the hearing closed. It is upon this record that the following findings and conclusions are based.

**APPEARANCES**

For the Company:    Brian G. Patterson
                    James C. Crowley
                    Akin Gump Strauss Hauer & Feld, LLP

For the Union:      Margaret Lecocke
                    Williams Hart Boundas Easterby, LLP

**I.  ISSUE**

The issue to be decided, per stipulation of the parties, is whether the Company had just cause to terminate the Grievant and, if not, what the remedy should be.

## II. BACKGROUND

The Grievant worked for the Company for five years, most recently as a Distribution Operator in its Freeport, Texas chlorine plant. In November 2022, the Grievant received a five-day suspension without pay for making inappropriate comments about female co-workers. The Union did not grieve the suspension. In addition to the suspension, the Grievant was required to apologize privately to the female co-workers and publicly to all of the members of the Cell Services unit where he worked.

The facts alleged by the Company – and downplayed but not outright disputed by the Union – are as follows: During his private apology to one of the female co-workers, Crystal (Nicholson) Schulz, the Grievant told Ms. Schulz that he learned details of the investigation into the conduct underlying his suspension from Union Steward Robert Bell, Jr. When other bargaining unit operators learned of this, they were alarmed and questioned Bell's integrity to act as a Union Steward.

Shortly thereafter, the operators held an operators-only meeting (while Bell was on vacation) to discuss the matter. Lead Operator Mike Matejowsky and current Steward Don Johnson testified that, during that meeting Matejowsky told the operators that Bell had told the Grievant what happened during the investigation underlying his suspension. According to these witnesses and others who were interviewed during the subsequent investigation, upon hearing Matejowsky say this about Bell, the Grievant nodded his head and did not say anything to dispute it. Matejowsky added that he was sitting next to the Grievant and heard the Grievant muttering that Bell had told him information from the investigatory interviews. The operators decided to wait until Bell returned from vacation before they decided whether to vote to remove him as Steward.

pg.   2

Immediately after this meeting, Johnson overheard the Grievant and another operator, Ray Cavillo, when all three of them were in the men's change room (but Johnson was out of view in a stall). According to Johnson, Cavillo told Brown that he put Bell in jeopardy as the Union Steward, and that he should have kept the information Bell gave him to himself. According to Johnson, the Grievant told Cavillo that "this [was] all Crystal's fault for even saying something." Johnson said that he came out of the stall, looked Brown and Cavillo in the eyes, washed his hands and left the change room.

The operators held another operator-only meeting after Bell returned from vacation, this time to confront Bell about the allegations he had shared information about an investigation and to vote on whether to remove him as Steward. During this meeting, Bell denied sharing details of the investigation and the Grievant backed Bell up, saying that Schulz was lying and it was Human Resources Manager James Myers who shared information about the investigation with him, not Bell. Bell told the operators "I've got dirt on all of you m-effers" and "I'll put cases on all of you."

Johnson, who was off work when this second meeting happened, learned about what the Grievant and Bell said the following day. He testified that the Grievant told him Crystal Schulz was a liar for saying Bell gave him information about the investigation.

The operators – members of the bargaining unit – reported what happened to Schulz. Schulz then reported it to management, which commenced an investigation into Bell's conduct. The investigation was conducted by two Human Resources officials, Kelly Ames and Doug Parker, who did not oversee Cell Services, specifically because they did not have prior history with any of the witnesses. It is important to clarify that nobody testified, and no documents

suggest, that the investigation the Company initiated was focused on the Grievant's conduct. However, the Grievant was interviewed as part of that investigation.

Ames kept detailed notes of the witness interviews. She and Parker interviewed a total of 13 witnesses. Schulz and Johnson were interviewed twice. Matejowsky was permitted to sit in on two of the interviews – Manny Herrera and Johnson's second interview – when the operators requested it because their regular Union Steward (Bell) not being available due to his involvement in the underlying facts.[1]

During his December 6, 2022, interview with Ames and Parker, the Grievant denied telling Schulz that Bell had shared details of the suspension investigation with him. He said that Bell never shared details of that investigation with him. The Grievant also denied having a conversation with Cavillo in the men's room about protecting Bell and Schulz allegedly lying.

Ames testified that she and Parker concluded that the Grievant was untruthful during the investigation into Bell's alleged threats and leaking confidential information, which is a violation of the Company's Group A Work Rules and Code of Conduct. Specifically, Ames said that the Grievant was dishonest about (1) telling Schulz that Bell had shared details of the suspension investigation with him; (2) the conversation with Cavillo in the men's room; (3) nodding in agreement during the first operators' meeting when Matejowsky said Bell had shared details of the investigation with him; and (4) recanting what he originally said about Bell and saying instead that it was Myers who shared information with him.

Ames said that she shared this finding with Company officials and recommended a step of discipline – which, as he was already at the penultimate step of discipline with the November

---

[1] There was a Union Steward present in all of the interviews – Ed Harvey sat in on most of them, and Charlie Singletary sat in on the Grievant's interview. It is not clear why Johnson and Herrera also wanted non-Union representation.

2022 suspension, put the Grievant at termination. Josh Dawes, the Cell Services Supervisor, made the final decision, along with other Company officials. On January 16, 2023, James Myers, the Human Resources Manager who had recused himself from the investigation into Bell due to his being a part of the underlying facts, issued the Grievant a termination letter stating in relevant part:

> The purpose of this letter is to inform you that your employment is being terminated, effective today January 16, 2023, for making a false statement about your actions in the course of an investigation conducted by Human Resources on December 6 and 7. Your actions violated Olin's Code of Conduct and Olin Work Rules. Additionally, your active discipline record reflected a third step of discipline at the time.

The Union grieved the termination on January 23, 2023, stating, "The Union contends this is unjust and untrue and requests the company to put Mr. Brown back to work."

During the hearing, the Company called Crystal Schulz, Mike Matejowsky and Don Johnson to testify about the underlying facts. It called Kelly Ames to testify about the investigation and Josh Dawes to testify about the Company's disciplinary decision. The Union waived making an opening statement and did what I would characterize as a light cross-examination of the Company's witnesses. The Union did not call any witnesses. The Union reserved its argument in this matter for its closing brief.

In its closing brief, the Company methodically goes through the evidence of the Grievant's misconduct, describing each witness' testimony in detail. It emphasizes the credibility of the witnesses and asserts that their testimony constitutes substantial evidence that proves there was just cause for the Grievant's termination. The Company describes the Company's investigation as "thorough" and the investigators' recommendation as "supported by credible and

unrefuted evidence." The Company emphasizes that the Union offered no evidence to rebut or question the investigation's core findings. It explains how the Grievant's conduct violated the Company's Work Rules and Code of Conduct, of which the Grievant had notice, and argues that termination was appropriate because the Grievant's misconduct was serious and because he was on the last step of progressive discipline at the time this matter occurred. Finally, it asserts that the Union offered no evidence of mitigating factors.

In its closing brief, the Union does not argue that the Company's evidence of the Grievant's misconduct was not compelling. The Union's argument is entirely focused on due process – most specifically, on the facts that the only investigation the Company conducted was into alleged misconduct by Robert Bell, Jr., not the Grievant; that the Grievant was never advised that he was under investigation for being dishonest; and that the Grievant was never interviewed about his alleged dishonesty before receiving discipline. The Union also takes issue with the Company's allowing Matejowsky, a non-Union official, to sit in on interviews of other witnesses.

## III. FINDINGS

In a discipline grievance, the employer has the burden to prove by a preponderance of evidence that the discipline was issued for just cause. Just cause requires proof, among other things, that the employee engaged in the conduct for which discipline was imposed, that the level of discipline was reasonable and in accordance with the parties' contract and the employer's policies, and that the employee was provided adequate due process in the disciplinary process.

Here, the proof of the Grievant's misconduct is undisputed. The Union did not offer any evidence to rebut the witnesses who testified about what they observed the Grievant say and do.

pg.  6

The only challenge the Union raises to any of the testimony has to do with Matejowsky's sitting in on two of the other operators' interviews during the investigation into Bell. If Matejowsky had provided information to the Company *following* his observation of the other witness' interviews, the Union might have a stronger argument on this point. However, Matejowsky had already told the investigators what he observed before he sat in on anyone else's interviews. He was the first witness interviewed and he was not interviewed again after sitting in on those other interviews. Therefore, because I do not know of any rule or just cause principle that precludes one witness from observing the testimony of another witness outright, I do not see a problem with Matejowsky sitting in on the other operators' interviews in this case.

The Company conducted an investigation into Bell. The Grievant was only a witness in that investigation. Ames was correct when she testified that the Company is permitted to expand its investigation when that investigation unearths new facts. The Company was not obligated to conduct an entirely new investigation – it was free, for example, to use information gleaned from witness interviews in the Bell investigation to support its case against the Grievant once he became the target of an investigation himself. The Company did not need to announce a new investigation and re-interview the same witnesses.

Nor did the Company need to advise the Grievant of the specific charges against him – meaning the specific rules he had broken – before terminating him. While this is required for public sector employees, the standard for due process is somewhat less stringent for private sector employees. Private sector employees are entitled to know the specific rules that they are alleged to have broken by the time they receive discipline, so that they can effectively grieve any discipline they receive, but a private employer is free to decide what rules were broken after an investigation is otherwise complete.

What is required for private sector employees – what is really the *sin qua non* of "industrial due process" – is that they be confronted with the *factual allegations* against them and have an opportunity to "tell their side of the story" before receiving discipline. Kelly Ames acknowledged as much in her testimony, when she was asked whether the Company is obligated to notify an employee that it has learned of additional misconduct during the course of an investigation, including misconduct by employees other than the original subject of the investigation. Ames answered, "No. There is an obligation to ask that individual questions about it; yes." In other words, Ames correctly stated that, if the Company conducts an investigation into one employee, and during the course of that investigation learns about potential misconduct by another employee, it is not obligated to notify the second employee that he or she is now part of the underlying investigation; however, the Company *is* obligated to ask the second employee questions about any misconduct he or she is alleged to have committed, and allow the second employee to answer to those factual allegations.

The problem in this case is that the Grievant was never interviewed about dishonesty during the Bell investigation. He was never given the opportunity to address the factual allegations about his dishonesty during the Bell investigation. The Grievant was asked about his conversation with Crystal Schulz, his statements about Bell leaking details of the suspension investigation to him, and his conspiring with Bell and Cavillo to deny his previous statements and place blame on Schulz and/or Myers. But he was not *disciplined* for any of those things. The sole reason given in his termination notice was that he lied when he answered those questions during the investigation into Bell.

I do not hold employers to a particularly high standard of giving employees their "day in court" before discipline. I do not believe it has to be a formal process. As I said above, I do not

believe that the employee has to be advised about violating a specific rule prior to receiving discipline. I do not believe the Company needed to initiate a new investigation or even interview the Grievant a second time. It would have been sufficient if, during his December 6, 2022, interview, Ames and Parker had simply asked something to the effect of, "Are you sure you are telling the truth about that? Several other people have told us the opposite. Do you understand that being dishonest during this investigation is grounds for discipline?" If that had happened, I would be satisfied that the Grievant received an opportunity to "tell his side of the story" about whether he had lied during the investigation or not. But I have thoroughly reviewed Ms. Ames' testimony, as well as her interview notes, and I cannot find any evidence that she or Parker asked the Grievant anything like that.

There do not appear to have been any exigent circumstances that would have excused the Company's obligation to allow the Grievant to tell his side of the story before receiving discipline. Almost six weeks elapsed between the Grievant's dishonesty and his termination, during which time it appears the Grievant continued to work. Based on my research there are some arbitrators who abide by the no-harm-no-foul principle when assessing issues of due process. My personal position is that, in private sector employment, although due process is somewhat flexible, giving the employee an opportunity to tell his or her side of the story is the bare minimum.

The Company has offered more than sufficient evidence to show that the Grievant was dishonest during the investigation into Bell. Dishonesty is a serious violation and would support at least one step of discipline, which in this case would have been termination. The people who provided the information to show that the Grievant was dishonest were his fellow bargaining unit members, something that is unusual. It is understandable that they do not trust the Grievant and

do not want him to return to work. Which makes this outcome dissatisfying, but necessary to support the minimum standards of just cause and due process.

"Most of the protections extended to public sector employees have been applied in some degree by courts and arbitrators to private sector employees. This is especially true of the right of such employees to receive notice of the charges against them and of the nature of the employer's evidence, and to be given an opportunity to be heard." *The Common Law of the Workplace* (2nd ed. 2005)(Theodore J. St. Antoine, editor) at Section 6.12. Due process required that the Grievant be told that the Company believed he was dishonest during the investigation and given the opportunity to respond to that charge. It does not matter that many of us may surmise that he would have just denied lying – due process is in many ways a formality, a process, but it is a crucial element of just cause that cannot be dispensed of simply because it does not seem like it would make any difference.

The due process violation means that the Grievant must be put back to work, with back pay – not because he deserves it, but because the process was flawed.

## IV.  AWARD

The grievance is sustained. The Company lacked just cause to terminate the Grievant because it failed to observe his basic due process rights in the steps leading up to his termination. The Grievant shall be reinstated with back pay.

January 15, 2024.

_____
Angela D. McKee
Arbitrator

# Exhibit  2

Trim Box Size: 5.5 x 8.5 in

FRONT COVER_p1



**COLLECTIVE BARGAINING AGREEMENT**

**between**

**Blue Cube Operations, LLC**
**\*A wholly owned subsidiary of Olin Corporation**

**Texas Operations**

**and**

**INTERNATIONAL UNION OF OPERATING ENGINEERS**

**Local No. 564**

**Made Effective February 6, 2023**

OLIN RESTRICTED - For internal use only

TRIM
COIL SAFETY ZONE

EXHIBIT

Company 1



**INDEX**

| | | Page No. |
|---|---|---|
| Arbitration Procedure | Article XIX | 33 |
| Award Programs | Exhibit E | 52 |
| Cell Services | Article XXXI | 43 |
| Classifications & Wages | Article XXV | 40 |
| Clothing on Certain Jobs | Article XX | 34 |
| Contracting of Work | Article XXXVIII | 46 |
| Department Side Agreement | Article XXVIII | 41 |
| Discipline | Article XXXII | 44 |
| Dues Check-off | Article XXIII | 38 |
| Duration | Article XXXIX | 47 |
| Grievance Procedure | Article XVIII | 32 |
| Holidays | Article VI | 12 |
| Hours of Work | Article IV | 6 |
| Hurricane Pay | Article XXXVII | 46 |
| Industrial Park (I-Park) | Article XXXVI | 45 |
| Jurisdiction | Article II | 5 |
| Jurisdictional Disputes | Article III | 5 |
| Jury Service | Article VIII | 14 |
| Lead Operator | Art IV Sect 8 | 8 |
| Leave of Absence | Article X | 16 |
| Maintenance of Company Rules | Article XIII | 21 |
| Maintenance of Membership | Article XXIV | 40 |
| Management Driven Schedule Change | Article IV | 7 |
| Maximum Allowable Work Hours/Days | Art IV Sect 11 | 9 |
| Miscellaneous Pay Practices | Article XXVI | 41 |
| No Discrimination | Article XXIX | 42 |
| No Strikes or Lockouts | Article XXI | 34 |
| Non-Traditional Assignments | Art IV Sect 9 | 9 |
| Operating Departments | Exhibit D | 52 |
| Overtime Regulations | Article V | 11 |
| Pay Day | Article IX | 16 |
| Pension | Exhibit C | 51 |
| Physical Examinations | Article XII | 20 |
| Plant Definitions | Exhibit B | 51 |
| Preamble | | 4 |
| Recognition | Article I | 5 |
| Safety | Article XIV | 22 |
| Savings Clause | Article XXVII | 41 |
| Seniority | Article XVII | 25 |
| Severance Packages | Article XXXV | 45 |
| Shift Differentials | Article IV | 7 |
| Show-up Time | Article VII | 14 |
| Sick Leave | Article XXII | 35 |
| Signatures | | 48 |
| Site Logistics | Article XXX | 42 |
| Special Relief Operator | Art IV Sect 7 | 8 |
| Texas Operations Work Flexibility | Article XXXIV | 45 |
| Temporary Classifications | Article XV | 22 |

OLIN RESTRICTED - For internal use only
- 2 -

| | | |
|---|---|---|
| Training Initiatives | Article XXXIII | 44 |
| Union Officers | Article XVI | 23 |
| Vacation | Article XI | 17 |
| Wage Rates | Exhibit A | 49 |
| Witnesseth | | 4 |
| Work Stoppage Training | Article XXXVIII | 47 |

## PREAMBLE

This agreement entered into by and between **Blue Cube Operations, LLC, A wholly owned subsidiary of Olin Corporation,** Freeport, Texas, its successors and assigns, hereinafter referred to as the "COMPANY", and Local No. 564, International Union of Operating Engineers, AFL-CIO, hereinafter referred to as the "UNION".

## WITNESSETH

The COMPANY and the UNION, having a common and sympathetic interest in the progress of industry, have entered into this agreement in order to promote and maintain harmonious relations between the COMPANY and its employees covered hereby, to ensure the most efficient operation of the plants of the COMPANY, and to provide means for adjusting any differences which may arise by rational, common-sense methods. Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
### Recognition

The COMPANY recognizes the UNION as the sole collective bargaining agency with respect to wages, hours, and other conditions of employment for all of its hourly-paid employees coming under the jurisdiction of the UNION as set forth in Exhibit A, exclusive of clerical, technical, plant protection employees, and supervisory employees having the authority to hire, discharge, or discipline employees or effectively recommend such action and who are employed at its plants at Freeport, Texas; all of said plants constituting a single bargaining unit. The term "supervisory employees" shall not include crew leaders, coaches or activity coordinators.

## ARTICLE II
### Jurisdiction

The parties hereto recognize that certain work comes within the jurisdiction of the UNION and only in cases of emergency may employees, other than those represented by the UNION, be assigned to work within this recognized jurisdiction. The UNION also recognizes that in a production plant of this kind, the principles of jurisdiction must be applied with common sense and some flexibility in order to give the proper consideration to the practical problems of production involved. Accordingly, the UNION agrees to apply a rule of reason consistent with the above circumstances in connection with jurisdictional questions arising under this contract.  In a further effort to eliminate jurisdictional questions, the parties agree that for the purposes of this Article an emergency shall be a fire, explosion, flood, hurricane, storm, line rupture, or power failure which requires immediate action, or any condition which threatens life, health, or property.

This Article is not to be construed to prevent the COMPANY from using technical employees as operators on experimental semi-plant work.  Operators will not be replaced by technical employees on a job being performed by an operator on a routine regularly scheduled basis in an experimental semi-plant except when necessary to do so for the purpose of determining technical information needed for the research project.

## ARTICLE III
### Jurisdictional Disputes

Any Jurisdictional disputes that cannot be settled, the Union can invoke the Arbitration Procedure.

The UNION agrees that in no event shall a jurisdictional dispute interfere in any way with the commencement, progress, or prosecution of the work or serve to increase the cost of the work to the COMPANY by reason of payment in wages to any employee for work not performed.  Pending settlement of any dispute, the work shall continue to be performed in the manner in which it had been assigned to be performed at the time the dispute arose.

ARTICLE IV
**Hours of Work**

**Section 1.  Workdays and Workweeks**

(a)  Day Shift: 6:00 AM to 6:00 PM (first shift of the day).

(b)  Night Shift: 6:00 PM to 6:00 AM (second shift of the day).

(c)  Individual departments will have the latitude to move shift change earlier in the day by as much as one (1) hour in 30-minute increments – e.g. shift changes at 5:00 AM and 5:00 PM or 5:30 AM and 5:30 PM.

(d)  Shift change after 6:00 AM (e.g. 6:30 AM) will not be permitted as it encroaches on other plant activities – e.g. morning meetings, maintenance activities, etc.

(e)   All twelve-hour shift teams and individual team members within a given department will agree to one common shift relief time.

Workday:
- A workday is defined as the 24-hour period from 6:00 AM on one day to 6:00 AM the following day.

- The latitude for modifications to shift change time applies.

Workweek:
- A work week is defined as the period from 6:00 AM Monday to 6:00 AM the following Monday.

**Section 2.  Work Schedules**

(a)  **Shift Workers.**  "Shift Work" is defined as work where the duties of one crew (consisting of one or more individuals) are taken up immediately by another such crew which in turn at the end of its shift has its work taken up immediately by a third such crew, etc.  All employees whose work comes under this definition are recognized as Shift Workers.  The normal schedule for Shift Workers shall include the following: five eight-hour periods per workweek beginning at 7:00 a.m., 3:00 p.m., or 11:00 p.m., or three and four twelve-hour periods in successive workweeks where the days of the week to be worked and the starting hour for each day for a given shift crew being based on a prearranged schedule.  Shift Workers will have schedules around the clock, with similar days off. If requested by an operating department, any changes from 12 to 8 or 8 to 12- hour shift will be voted on in the 4th quarter. Decision for a change must be communicated to Labor Relations by November 30th so there is time to get changes made in payroll and to enable employees to schedule vacation according to the defined vacation scheduling practices in Article XI. Changing shifts would require two-thirds majority. Votes will be cast by a closed ballot. Alternate work schedules (including Day Operators) will continue to be defined by Company Leadership.

TRIM
COIL SAFETY ZONE

(b) **Day Workers.**  All employees not defined as Shift Workers according to paragraph (a), above, are recognized as Day Workers.  The normal schedule for Day Workers shall be 7:30 a.m. to 4:00 p.m. with one-half hour off for lunch, Monday through Friday.  The regular lunch period will be 11:30 a.m. to 12:00 noon, but a lunch period of 12:00 noon to 12:30 p.m. can be scheduled when 11:30 a.m. to 12:00 noon coverage is required, and if notice is given the preceding day or sooner.  If Day Workers are required to work through their lunch period, they will be paid time and one-half for that period and will eat lunch on the job at an opportune time in keeping with the work demands of the job.

(c) **Odd Schedules.**  It is recognized that Odd Schedules differing from the normal schedules described above are necessary for the proper coverage of all operations, and that the COMPANY has set up in the past and will set up in the future Odd Schedules for both Shift Workers and Day Workers.

It is agreed that whenever it becomes necessary for the COMPANY to establish a new Odd Schedule, the steward involved will be called in by the COMPANY to make suggestions regarding the schedule to be set up.  No new schedule will be put in effect unless it is for a five-day period or more.

Odd Schedules for Day Workers will be set up on an eight-hour basis with lunches eaten on the job at an opportune time in keeping with the work demands of the job.  However, Day Workers on odd schedules who are not required for continuous eight-hour coverage will have a half-hour off for lunch on their own time.

All vacancies or new jobs that are a different schedule than a regular shift schedule will be filled in accordance with Article XVII, Section 11, "Filling Vacancies or New Jobs".  However, this will not prevent the rotation of employees performing the same job.

(d) Various groups or departments may have an agreement on shift schedule/relief time by a majority vote of the operators involved and department leader approval.

### Section 3.  Shift Differentials

A shift differential of $0.65/hour will apply for all shift workers for all hours worked. When day workers are put on shift for longer than 8 consecutive weeks, they will be given the shift differential for the time they are assigned to work shift.  When shift workers are put on days for longer than 8 consecutive weeks, the shift differential will be taken away.

### Section 4.  Management Driven Schedule Change

Management has the right to make appropriate schedule changes.  In circumstances where management must change an employee's schedule on a short-term or temporary basis, as much notice as possible will be given to the employee. The employee will not incur a negative financial impact as a result of a management driven schedule change.  There will be no additional or premium

TRIM
COIL SAFETY ZONE

pay simply for the inconvenience of the schedule change. Leaders are expected to give 48 hours' notice and minimize management driven schedule changes. If in the union's opinion the use of this article is used over and above its intent, Labor Relations agrees to investigate the issue with department leadership and the department Steward.

**Section 5. Shift Trade**

A shift trade is defined as the ability of employees to trade shifts with other employees. Employees are permitted to trade shifts with other employees with the approval of their leadership. A shift trade must not conflict with COMPANY safety objectives or efficient plant operations. Shift trades must occur in the same payroll week, as defined at the site, and must not involve overtime for any employee involved. Meetings, training classes or other scheduled activities must not be adversely affected by a shift trade.

All trades will be voluntary and are the responsibility of the trading employees. Each trade will be considered on a case-by-case basis, as necessary and routine or regular trades will not be approved.

**Section 6. Absences from Work**

Employees will give the COMPANY as much advance notice as possible in case of personal illness, serious illness or death in their immediate family, or other extreme emergency making absence from work necessary without obtaining such advance permission from the COMPANY, and such absences will not be considered unexcused. Unexcused absence and excessive absenteeism are performance issues.

**Section 7. Special Relief Operators**

Special Relief Operators who are regularly required to work irregular schedules on different jobs in order to replace employees on vacation, employees who are sick, etc., and who, as a result do not have any regularly scheduled days off and are not entitled to advance notice of schedule changes, will be paid a premium of $1.00 per hour over and above the top rate of the highest paid job they are regularly assigned to work. Special Relief Operators will be selected by the COMPANY using the internal selection process.

**Section 8. Lead Operators**

The Lead Operator Adder may be used to provide on-shift coaching, resource coordination, direction, as well as multiple formalized training and mentorship and will be paid a premium of $1.00 per hour adder if they are working a rotating shift schedule, and a $2.00 per hour adder if the operator is on a schedule that does not provide a shift differential. Candidates must demonstrate strong process knowledge and strong teamwork, interpersonal and leadership skills and is looked upon as a resource by team members. The Lead Operator should be trusted by team members and lead from a position of influence. The specific duties and responsibilities of the role will be defined by department leadership. This adder would normally not be applied to employees who are still in progression.

TRIM
COIL SAFETY ZONE

Employees will be selected by leadership for these roles based on performance as well as knowledge, skills, and attitude and with Labor Relations approval. Lead Operator is not a Classification nor is it permanent and may be removed at leadership's discretion. Upon request by the Union, the Company will provide a written explanation for any such removal.

### Section 9. Non-Traditional Assignments

Employees may be assigned to perform work not historically under the jurisdiction of the Union. In this case, the Union agrees that a separate contract is not created when employees are assigned non-bargained for work and agrees not to claim jurisdiction over work or jobs assigned to Union employees historically outside the jurisdiction of the Union. The duration of the NTA assignment is based on need; and is not limited to a specific time period. Employees selected to Non-Traditional Assignment roles will receive the Lead Operator Adder while actively performing in the role.

### Section 10. Breaks

Breaks will be taken on the basis of individual physical need, with consideration for the job.

### Section 11. Maximum Allowable Employee Work Hours and Days

| Purpose & Scope | To provide reasonable assurance that the safety and health of employees, co-workers, facilities, and the community are not adversely affected because of fatigue caused by excessive work hours. |
|---|---|
| Background | Lack of adequate rest leads to fatigue. Fatigue has the potential to cause impaired judgment and/or difficulty focusing closely on a task. |

**Exceptions**

Approval to work beyond the limits described will only be considered appropriate when stopping work is reasonably likely to cause an EH&S related incident or non-compliance with governmental requirements.  Business criticality is not justification for extending work hours beyond the described limits.

Some examples of appropriate exceptions may include:
- Emergency shutdowns
- Emergency response activities
- Shutdown of an environmentally sensitive operation
- Leaking equipment which, if not corrected in a timely manner, may result in exceeding a reportable quantity or in negative impact to the environment or community.
- Hurricane duty

The Department Leader where the work is being completed AND the Work Group Leader if these are different leaders must approve any exceptions before the hours are worked.

Definitions
- Consecutive hours and days worked are based on actual hours and days worked.
- Four hours of actual work will constitute a workday for tracking consecutive days (e.g., in the case of call outs)
- The Work Group Leader is the administrative supervisor of the employee

Consecutive Hours of Work
- The maximum total hours any employee can work in <u>any</u> 24-hour period is 16 hours.

Consecutive Days of Work
- An employee will not work more than three consecutive 16-hour days.
- After three consecutive 16-hour days the maximum total hours an employee can work in any 24-hour period is 13 hours.  A rest period of at least 16 hours must be completed before the employee can resume working 16-hour shifts.
- An employee will not work more than 21 consecutive days without 48 hours off work before the employee's next workday.  If it is a scheduled day's work the Company will make the employee whole.

**Boundaries**
- **No cancelation of scheduled vacation**
- **This will be added to all overtime agreements.**

OLIN RESTRICTED - For internal use only
- 10 -

ARTICLE V
**Overtime Regulations**

**Section 1.  Overtime Pay**

Overtime hours are paid at 1.5X the straight time rate for hours worked outside an employee's normal work schedule or for working greater than 40 hours per week.

(a)     Outside the normal work schedule includes the time worked in addition to the daily work schedule and the day(s) an employee works outside his/her regularly assigned work schedule.

(b)     Where the normal work schedule is greater than 40 hours in a week, overtime that has been built into an employee's weekly work schedule will be paid at 1.5X only if the previous 40 hours in that same work week were physically worked.  Civic Duty, Personal Choice Days and Vacation count as time worked; Holidays count as time worked only if they fall on the employee's normally scheduled workday and are not worked.

(c)     Overtime hours applies to hours worked over 40 hours in a work week.

(d)     Hours on which overtime has been paid will be excluded from computation of overtime payment on any other hours.

**Section 2.  Call-in Pay**

Employees who are called in to work outside of their regular hours will receive a minimum of four hours pay at straight time.  The minimum pay will not apply if the hours worked are continuous with their regular schedule.

**Section 3.  Overtime Distribution and Coverage**

Every reasonable effort will be made to distribute overtime hours, and premium hours involving time and one-half or more, in an equitable manner.  Various groups and/or departments may work out methods for assuring that this is done (Overtime Agreement, Article XXIX).  The Overtime Agreement must contain a provision that all overtime will be covered.  The steward and department leader will work together to develop and implement an appropriate process that in the event there are no volunteers to cover overtime, a qualified employee will be assigned.   These methods shall be reviewed annually on a date selected by the steward and department leader for the purpose of making appropriate changes.

Overtime created by short notice (four hours' notice or less) shall be filled by offering the employee on the job first opportunity to work.  If he/she declines, the regular overtime procedure should be followed.  This is not intended to supersede departmental methods which define "short notice" as greater than four hours.

During start-ups, shutdowns, or emergency situations the Process Leader and Union Steward will determine the workforce and method needed for that particular situation based on department needs and budgetary constraints, while not violating the Fatigue Article IV, Section 11.

OLIN RESTRICTED - For internal use only

TRIM
COIL SAFETY ZONE

**Section 4.  Miscellaneous**

(a)  The regular schedule of an employee who has been called on to work overtime will not be changed for the purpose of offsetting his/her overtime pay.

(b)  None of the vacation benefit payments provided in this contract for time not worked will be paid at overtime or premium rates

(c)  The payment of overtime for any hour excludes that hour from consideration for overtime payment on any other basis.

(d)  Payment for working a shift will be based on the scheduled hours for the shift, regardless of private arrangements for early relief that employees may make among themselves.   However, employees may not relieve more than 30 minutes before the start of their regular shift.  Off-going shift workers who have been properly relieved and have spent a full shift on the job will be allowed to clock out without any pay penalty.  It is clearly understood that no premium will be paid as a result of the application of this early clock out arrangement or as a result of any private arrangements made among the employees for early relief.

**Section 5.  Seventh Day**

Double time (2X straight time rate) will only be paid to an employee who physically works seven (7) consecutive days.  Time worked does not include Civic Duty, Personal Choice Days, Vacation or Holidays not worked.  Only time physically worked counts toward the calculation of 7th day pay. The following rules apply in the calculation of 7th day pay:

(a)  A callout can count towards the 7th consecutive day calculation if the employee actually works a minimum of 4 hours.

(b)  Double time is not applied on the 8th day, 9th day, etc.

(c)  Employee must have prior approval from the Leader to work 7 consecutive days.

(d)  Does not apply to routine schedules which may include 7 consecutive days.

(e)  Employees whose schedule regularly includes 7 consecutive days will be paid double time for all hours worked on the 10th consecutive day if the previous 9 days were physically worked, subject to the above requirements.

(f)  The 7th consecutive day does not have to fall within the same work week.

ARTICLE VI
**Holidays**

**Section 1.**

The following holidays will be observed:  New Year's Eve Day, New Year's Day, Martin Luther King Day, Good Friday, Memorial Day, Independence Day, Labor

OLIN RESTRICTED - For internal use only

- 12 -

Day, Thanksgiving Day, Day After Thanksgiving, Christmas Eve Day, and Christmas Day.

Holidays falling on Sunday will be observed on the following Monday and holidays falling on Saturday will be observed on the preceding Friday, except that for rotating shifts with continuous seven (7) day coverage holidays will be observed on the day it falls.

NOTE: If the Company makes any modifications to its Holiday Policy during the term of this agreement, the Company will review these changes with the Union and will give the Union the option to negotiate.

**Section 2.**

Employees who are required to work on a fixed holiday will receive 2X for all hours worked, in addition to the 8 hours Holiday Pay.

**Section 3.**

Employees who do not work on a holiday or the day observed in place of a holiday and said day falls within their regular schedule, will be paid for eight hours at their straight time base rate. Employees who work a schedule that includes shift hours greater than 8 hours may elect to take any additional scheduled hours as vacation or as excused time off WITHOUT pay if the holiday is being observed by the work group. Employees will be paid for either hours at their straight time rate unless:

(a)  They are absent from work without permission of department supervision on their regularly scheduled working day immediately preceding or immediately following the holiday.
(b)  They are on extended leave of absence (more than 30 days) for reason other than illness or accident.

**Section 4.**

When a holiday, or a day observed in place of a holiday, falls on employees' regularly scheduled day off, they will be paid an extra day's pay that week (eight hours pay at their straight time base rate) if they would be eligible to receive holiday pay under the provision of Section 3 of this Article just as though this off-day were a regularly scheduled workday.

**Section 5.**

Employees regularly scheduled to work, or who are instructed to report for work on a holiday or the day observed in place of the holiday but who fail to report for work, will not be eligible to receive such pay. The COMPANY shall, when possible, give three days' notice to all non-shift employees who will be expected to work on a holiday that they will be required to work. In all but emergency cases, such three-day notice will be given to non-shift employees when they are expected to work on a holiday. Employees who do not receive such advance notice will not be expected to keep themselves available for such work unless they choose to do so.

OLIN RESTRICTED - For internal use only

## ARTICLE VII
### Show-up Time

The minimum pay for employees, who, in the absence of advance notice to the contrary, report for work on their regular shift, shall be their regularly scheduled hours at straight time for that shift.  This does not apply in case of fire or flood, or hurricane.

## ARTICLE VIII
### Jury Service

Employees kept away from work because of reporting for jury service, or for service as a witness under court subpoena in a criminal proceeding, will be paid their regular straight time hourly rate exclusive of any overtime or other premium pay subject to the following provisions:

**8 Hour Shift Employees**

**Day Court**

(a)   Employees working days are not required to report back for work if dismissed from court duty at or after 12:00 noon.  Employees dismissed before 12:00 noon are required to report for work and complete the workday.

   If employees working the day shift are not scheduled to report for court duty until 1:00 p.m. or later they will report for work at their regular starting hour and will be excused from work in ample time to go home to change clothes, eat lunch and report to the proper court on time.

(b)   Employees on the 11:00 p.m. to 7:00 a.m. shift will be excused on the shift immediately prior to such duty in court.  Such employees dismissed from court duty after 6:00 p.m. will be excused from work the same as though they were scheduled to be in court the following day.

   Employees scheduled to work the 3:00 p.m. to 11:00 p.m. shift are not required to report for work on this shift if dismissed from court duty at or after 12:00 noon.  If they are released before 12:00 noon they are expected to work their scheduled shift.

**Night Court**

(a)   Employees working the evening shift and reporting for court duty prior to 7:00 p.m. will not report for the start of their regular shift.  If released from court duty prior to 7:00 p.m., employees will report to work for the duration of the regular shift.

(b)   Employees working the graveyard shift and released from court duty after 9:00 p.m. will be excused from their next regular shift.

(c)   Employees working the day shift and excused from court after 11:00 p.m. will be excused from their next regular shift.

OLIN RESTRICTED - For internal use only
- 14 -

**12 Hour Shift Employees**

**Day Court/Night Court**

(a) An employee schedule for day court and working the day shift will be required to report to work if four or more hours of the scheduled shift remain when the court releases them. However, if their regular home to work commute exceeds one (1) hour and/or the court in which an employee is scheduled to appear is located more than one (1) hour away from the employee's work site, then the employee might be excused from returning to work with prior supervisory approval.

(b) An employee scheduled for night court and working the night shift will be required to report to work if four or more hours of the scheduled shift remain when the court releases them. However, if their regular home to work commute exceeds one (1) hour and/or the court in which an employee is scheduled to appear is located more than one (1) hour away from the employee's work site, then the employee might be excused from returning to work with prior supervisory approval.

(c) An employee working the day shift and scheduled for night court will be released from work in time to make their court appointment. If released from service before 11:00 pm the will be required to report for their following day shift. If released after 11:00 pm, they will not be required to work the following day shift.

(d) An employee scheduled for the night shift and who has received a notice to report for jury service the next day will not be required to work that night and will receive Jury Duty pay for the missed shift.

(e) An employee scheduled to work a 12-hour shift that begins at the same time they must contact the Jury Information Line and does not need to report for jury duty, will arrive at work as reasonable as possible and will be paid for such time missed on shift.

(f) When an employee is relieved of Jury Duty with 8 or more hours before the start of their normally scheduled 12-hour work shift, he/she should report to work at the normal scheduled time.

(g) When an employee is relieved of Jury Duty with less than 8 hours before the start of their normally scheduled 12-hour work shift, the employee will not be required to work that schedule 12-hour work shift.

(h) Employees must give notification as soon as possible when required to serve Jury Duty and such service will cause him/her to miss scheduled work time. This notification will be required on a day-to-day basis.

Employees are required to furnish proof from the court of such service, showing the date and time served and amount paid for their service.

ARTICLE IX
**Pay Day**

Every other Friday, paychecks will be paid through Electronic Funds Transfer (EFT) / deposited in the savings account or bank account designated by the employee.

ARTICLE X
**Leave of Absence**

**Section 1.  Personal and Educational Leaves**

Employees who have been employed two years or more may be granted an unpaid leave of absence of up to 12 months upon request and satisfactory explanation by the employee. Educational leave will be used only for the purposes of enhancing the employee's career at Olin. Any leave shall not be used, except by permission of the COMPANY, for the purpose of accepting other employment or engaging in other financial endeavors.

**Section 2.  General Rules**

Leaves of absence described above are subject to the following provisions where applicable:

(a)  They must be requested in writing at least 15 days in advance, if they are expected to last 30 days or more, and at least five days in advance if they are expected to last less than 30 days.

(b)  Seniority will accumulate for the duration of the leave.

(c)  All employees granted such leaves, if they are expected to last more than 30 days, shall have their health history checked and recorded by the COMPANY physician at the time of leaving and again upon their return if they are gone more than 30 days.

Occupational Health Services will, upon request, send a copy of the examination report to a physician of the employee's choice.

(d)  Leaves of absence for any reason that lasts more than 30 days will be handled as though the employee has been removed from the payroll.

(e)  Employees desiring to return to active status from a leave of absence must contact their department or Human Resources before the expiration of their leave.  The date of their return to active status will be contingent upon the COMPANY'S need for personnel.

**Section 3.  Bereavement Leave**

An employee who wishes to take time off due to the death of a family member as defined below should notify his or her Manager as soon as possible. If an employee leaves work early on the day he or she is notified of the death, that day

will not count as bereavement leave and will not affect the balance of bereavement leave that the employee has available. In addition to bereavement leave, an employee may, with his or her Manager's approval, use any available vacation for additional approved time off as necessary. The company reserves the right to ask the employee to provide documentation to verify the circumstances of their bereavement leave.

Bereavement pay is calculated based on the base pay rate at the time of absence, and it will not include any special forms of compensation, such as incentives, commissions, bonuses, overtime, or shift differentials.

Paid bereavement leave will be granted according to the following guidelines:
- Employees are allowed up to five consecutive days off from regularly scheduled work with regular pay in the event of the death of the employee's spouse, domestic partner, child, stepchild, parent, stepparent, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother, sister, stepbrother, stepsister, grandparent, or grandchild.

### ARTICLE XI
### Vacation

**Section 1.  Amount of Vacation**

All employees will accrue vacation on a monthly basis.

Employees will be allowed to take vacation in advance of accrual within the year but will be required to reimburse the company for any unearned vacation time taken in advance of the accrual if they leave the company.

Vacation payout for unused vacation is also based on the monthly accrual schedule.

Calendar year 2020 will serve as a grace period for those employees who have historically gained access to their entire accrued full vacation eligibility allotment at the start of the calendar year.
The table below lists the vacation accrual rates based on employee years of service:

| Years of Service | Hours Per Year | Hours Per Month |
|---|---|---|
| 1 year | 120 | 10.00 |
| 2 years | 136 | 11.33 |
| 3-4 years | 152 | 12.67 |
| 5-9 years | 168 | 14.00 |
| 10-14 years | 184 | 15.33 |
| 15-19 years | 200 | 16.67 |
| 20-24 years | 216 | 18.00 |
| 25-29 years | 232 | 19.33 |
| 30 years | 240 | 20.00 |

The increase to the next accrual level will occur at the start of the year during which the employee attains the respective increase in service level.

New hires will start with the potential to earn up to 120 hours of vacation per year.

New hires will receive a prorated amount of vacation time based on the number of months they will work that year.  If the employee starts before the 15th of the month, that month will count in the accrual calculation.  If the employee starts on the 15th of the month or later, that month will not count in the accrual calculation.

**First Full Calendar:**

(a) Vacation hours will be earned at the rate of 1/12th per month and available on the first of each calendar month. Employees may take full year vacation entitlement prior to accrual.

(b) Vacation may be taken in 1-hour increments.

(c) Upon termination, unused vacation time that has been accrued through the last day of active employment will be paid at the employee's current base rate of pay.  In the event of the employee's death, unused vacation time will be paid to the employee's estate or designated beneficiary.

(d) Employees may carry over additional hours outside of the policy limits for an approved business reason with Officer approval.

(e) Under no circumstances shall vacation paid at termination exceed the maximum carry over amount *40* hours plus current year's *accrued*.

(f) Employees are not allowed to borrow vacation from the following year. Employees are also not allowed to sell or gift vacation.

(g) Up to 40 hours may be carried over into the succeeding year.  All carry over vacation must be used the year carried into.

NOTE: If the Company makes any modifications to its Vacation Policy during the term of this agreement, the Company will review these changes with the Union and will give the Union the option to negotiate.

**Section 2.  Personal Choice Days**

Employees will receive 24 hours of personal choice time each year (granted in January).

New hires will receive a prorated amount of personal choice time based on the number of months they will work that year. If the employee starts before 15th of the month, that month will count in the accrual calculation. If the employee starts on the 15th of the month or later, that month will not count in the accrual calculation.

(a)  The personal choice time can be taken for any reason by each individual. All hours must be taken in full one-hour increments.

(b)  Scheduling personal choice time should comply with department guidelines.

(c)  Personal choice time may not be worked for premium pay.

(d)  Personal choice time must be taken in the year awarded.

(e)  Unused personal choice time will not be carried over to the next year.

(f)  Unused personal choice time will not be paid if an employee leaves the COMPANY for any reason (termination, quit, retired, etc.).

Personal choice time cannot be borrowed from the following year.

(g)  If personal choice time is exhausted, vacation time will be used in its place.

**Section 3.  Vacation Rules**

(a)  All vacation must be scheduled well in advance with department supervision so as not to interfere with the economical operation of the department or group involved.  It may be taken in 1-hour increments.  After following the department's overtime procedures, the ultimate responsibility for securing a replacement, if one is needed, belongs with the employee requesting the short notice vacation.

(b)  Vacation schedules will be available at 7:30 a.m. on the first Monday of December of the current year for all employees who desire to schedule all or part of their vacation for the following year.  Vacations will be scheduled on a first come first served basis with the following exception.  For the first seven calendar days preference will be given to the first employees who request vacation during Thanksgiving week, first week of deer season and Christmas week who had not had vacation during these periods the previous year.  Yearly schedules will be completed as soon after the first of the year as possible.

All employees will schedule all remaining vacation that must be taken that year by September 1.

Employees may change all or part of their vacation schedule during the year provided they and the department supervision approve such changes well in advance of the change and provided such change is made in accordance with the provisions outlined above.

(c)  Vacation pay will be at the employee's current hourly rate and will be paid only for days he/she is scheduled to work.

(d)  Employees who agree to work a shift on a day on which they were scheduled to work another shift but which they have already scheduled to take as vacation, said vacation must be rescheduled.

OLIN RESTRICTED - For internal use only
- 19 -

(e) Non-active employees with seniority who return from a leave of absence will be eligible for their next annual vacation, which will be the same number of days their next annual vacation would have been if they had not gone on leave.  Should an employee return to work after January, they will be credited with a pro-rated portion of the vacation the employee would have received if they had not gone on leave.  For example, if the employee returns to work during February, the employee will receive 11/12 of the vacation entitlement.  If the employee returns during March, they would receive 10/12 of their vacation entitlement, and so on.  Should an employee return during the calendar year in which they had taken a leave of absence, the employee would be entitled to any remaining vacation for which they had not been compensated, provided that they cannot receive more vacation in any one calendar year than they would have received if they had not been on leave.

ARTICLE XII
**Physical Examinations**

**Section 1.**

(a) Employees on leave of absence 30 days or over, or who have been absent from duty because of sickness or injury, will be required to obtain a return-to-work slip from Occupational Health Services before returning to work.

(b) The employee is responsible for keeping his/her leader informed of their return-to-work status, and when requested supply Occupational Health Services with a form from their treating physician(s), stating when absence began, expected return to work date, listing reasons for absence and any restrictions. Failure to provide a completed release form satisfactory to Occupational Health Services or failure by the treating physician to provide information requested in writing by Occupational Health Services may result in salary discontinuation.

(c) The COMPANY reserves the right to require employees on extended medical leave as determined by the COMPANY to periodically visit with Occupational Health Services staff for purposes of monitoring progress and return to work planning.

(d) After 5 working days of absence, the employee will supply Occupational Health Services with a form from their treating physician stating when absence began, expected return to work date, listing reasons for absence and any restrictions prior to returning to work.  Failure to provide a release form satisfactory to Occupational Health Services or failure by the treating physician to provide information requested in writing by Occupational Health Services may result in salary discontinuation.

(e) The COMPANY reserves the right to require an independent medical evaluation by a reputable medical specialist selected and paid for by the COMPANY in situations involving a difference of opinion between Occupational Health Services staff and the employee's personal physician.

OLIN RESTRICTED - For internal use only

Trim Box Size: 5.5 x 8.5 in

(f)  If an employee is given a return-to-work slip by Occupational Health Services for full or modified duties and fails to resume work, it will be interpreted as the employee's intent to quit, and he/she will be terminated from the COMPANY.

**Section 2.**

(a)  For the purpose of determining employees' fitness for duty in safely performing their regular job or any job to which employees may be assigned, during any period of employment with the COMPANY, the COMPANY reserves the right to require a medical evaluation by either the Occupational Health Services staff and/or any other reputable medical specialist selected and paid by the COMPANY.

(b)  Periodic examinations of employees will be continued with the principle ideas of helping employees improve their own health conditions and to enable the COMPANY to guard the health and safety of its employees.  Such evaluations may involve different mandatory elements of testing to determine continued fitness for duty.  Failure to comply could result in disciplinary action.

(c)  Employees who believe they have been exposed to a hazardous material or atmosphere in the performance of their work with the COMPANY may request through department supervision a physical examination by Occupational Health Services.  Such requests will be reviewed by Occupational Health Services and examinations which are indicated will be performed.  Occupational Health Services will, upon request, send a copy of the examination report to a physician of the employee's choice.

Except as noted, failure to meet the requirements in this Article may result in immediate salary discontinuation and could result in further discipline up to and including discharge.

**Section 3.**

Consistent with the Americans with Disabilities Act, the findings of the above medical examination shall not be used to affect adverse discrimination by either party against the employee involved.

ARTICLE XIII
**Maintenance of Company Rules**

It is further agreed by the parties to this Agreement that fair treatment, good service, and due diligence in the observance of the rules as promulgated by the COMPANY, are essential to the maintenance of satisfactory working conditions and wages described and set forth in the Agreement, provided that such rules as may be promulgated by the COMPANY shall not in any way conflict with the terms of this Agreement.

OLIN RESTRICTED - For internal use only

## ARTICLE XIV
### Safety

The COMPANY and the UNION agree that each will perform its proper function in promoting and maintaining safe working conditions and good housekeeping practices. The Site and the Departments may implement EH&S initiatives involving employee participation as individuals or on teams.

If a safety issue is not resolved satisfactorily or an unsafe condition or situation exists where an employee considers departmental safety rules as unreasonable, the issue should be brought to the attention of the Department Leader by the employee or the steward.  If there is no resolution, the employee or steward may request a final review of the problem by letter, addressed to the EH&S Responsible Care Leader with a copy to the Department leader.

## ARTICLE XV
### Temporary Classifications

Employees temporarily assigned to do the work of a higher classification for a period of two hours or more in a given shift shall receive the regular or overtime rate for such classification the same as if they were a regular employee on said advanced status for the entire shift.  However, employees temporarily assigned to do the work of a lower classification shall receive the regular or overtime rate for their regular assignment.  Such employees may be replaced by other employees qualified to perform their job.  These temporary vacancies will be filled by the senior qualified volunteer or by forcing the junior qualified employee.

"Temporarily assigned" is defined as meaning assigned for any temporary period of time, not to exceed 30 days, to replace an absentee or to do a job which is not the employee's regular line of duty.  If it is determined that the temporary assignment will last for more than 30 days such assignment will be made in accordance with Article XVII, Seniority, Section 11.  If a temporary vacancy exists because an employee is absent due to sickness or injury, that employee will, if he/she returns with full accumulated seniority and is still qualified, be allowed to resume his/her former job, even though the replacement may have more seniority.  All employees who fill temporary vacancies as a result of sickness or injury will be allowed to resume their former jobs within the department.  In the event an employee must leave the department as a result of this, he/she will be laid off in accordance with the layoff provisions of Article XVII.

Employees temporarily classified on a higher paid job and who have worked on the higher paid job as long as 45 days shall receive the top rate of pay for the job.

When employees are temporarily classified at a higher rate on both their last regularly scheduled workday before and their first regularly scheduled workday after the holiday and they are entitled to holiday pay, they shall be paid for the holiday at the temporary rate in which they are classified for those days.

"Temporarily assigned" as referenced and used in this Article is unique to this Article and does not apply to any other definition of temporary assignments in other

TRIM
COIL SAFETY ZONE

Articles or sections of this Agreement unless otherwise agreed to by the UNION and the COMPANY.

## ARTICLE XVI
### Union Officers

**Section 1.  Business Agents/Representatives/Managers**

The COMPANY agrees that accredited business representatives of the UNION that are not active employees, subject to full compliance with the COMPANY'S visiting rules, may visit the plant at reasonable times for the purposes of investigating a specific grievance or grievances theretofore made by employees or any other business pertaining to this contract, provided, however, that this investigation shall not interfere with either the efficient operation of the plant or the work being performed by any of the employees.  All such requests shall be made through Labor Relations.

Further the UNION acknowledges that it is the COMPANY's management right to determine which individuals shall be given badge access to the Site.  No employee, including business agents/representatives/officers/managers that are employees of the COMPANY will be allowed to conduct UNION business pertaining to this bargaining Agreement on COMPANY time unless he/she is recognized as a steward as provided in Section 2 of this Article, as provided in Article XVIII, or as approved by Labor Relations.

The UNION agrees that the business agents/representatives/managers that are active employees of the COMPANY will be expected to work at their job or trade at all times except when they are attending to a grievance or to questions involving conditions of employment.

**Section 2.  Stewards**

The UNION and the COMPANY agree that the minimum number of stewards consistent with the efficient operation of the various departments will be appointed.  The UNION agrees that the stewards will be expected to work at their job or trade at all times except when they are attending to a grievance or to questions involving conditions of employment.

Stewards will obtain permission from the Department Leader to leave their work when their presence has been requested by an employee in their operating department in the area of the plant to which they are assigned.  Any employee called in for any discussion concerning reprimand will be allowed a UNION representative upon their request.

If in the handling of a grievance it becomes necessary for stewards to leave their department, they shall upon entering another department, report to the Department Leader of that department or their designee.  They shall return to their job as promptly as possible and upon returning shall at once report to their Department Leader or their designee.

Within ten days after the signing of this contract, the UNION shall submit to the COMPANY a list showing the number of stewards and assistant stewards which it feels will be required for each department and/or division of the plant.  Upon agreement between the COMPANY and the UNION, as to the number of stewards and assistant stewards and their location in the departments and/or divisions of the plant, the UNION shall submit to the COMPANY a complete list of the names of the stewards and assistant stewards selected for these jobs.  The UNION shall keep this list up to date by submitting to the COMPANY as soon as changes occur a letter giving the name of each new steward and the name of the steward, he/she is replacing and the names of new stewards to the extent mutually agreed upon as required due to splitting departments or adding new departments.

**Section 3.  Delegate Leave**

Leaves of absence for up to three weeks will be granted to one or more delegates to attend UNION conventions.  The exact number will be determined by mutual agreement between the Business Agent/Representative/Manager and the COMPANY'S Labor Relations Department but will not be so many as to unduly interfere with plant work.

**Section 4.  Union Business Leave**

Upon written request from the UNION up to five employees, not more than one from any department, will be granted up to two days' leave without pay for the purpose of holding UNION elections or other UNION business pertaining to this Agreement. This will not exceed a cumulative total of 35 workdays per year.

Leaves of absence to not more than two employees for one year, subject to extension from year to year, will be granted for the purpose of working for the UNION.  Such employees will continue accumulating seniority in the plant as long as they are working for the local UNION servicing this Agreement.

Leaves of absence for up to 90 days to not more than two employees will be granted for the purpose of taking training for or performing UNION service connected with this collective bargaining Agreement.

**Section 5.  General Rules**

Leaves described above are subject to the following provisions where applicable:

(a)  They must be requested in writing at least 15 days in advance, if they are expected to last 30 days or more, and at least five days in advance if they are expected to last less than 30 days.

(b)  Seniority will accumulate for the duration of the leave.

(c)  All employees granted such leaves, if they are expected to last more than 30 days, shall have their health history checked and recorded by the COMPANY physician at the time of leaving and again upon their return if they are gone more than 30 days.

Trim Box Size: 5.5 x 8.5 in

Occupational Health Services will, upon request, send a copy of the examination report to a physician of the employee's choice.

(d) Leaves that last more than 30 days will be handled as though the employee has been removed from the payroll, with his/her status restored upon return as provided in this contract.

(e) An employee returning from leave in excess of 30 days described in this Article will return to the department in which they left.

ARTICLE XVII
**Seniority**

**Section 1.  Definition**

The term "Seniority" is defined to mean an employee's length of service.  An employee's seniority is measured from a "Seniority Date", the earlier the seniority date the more seniority the employee has.

**Section 2.  Type of Seniority and Commencement of Each**

(a) Plant-wide Seniority.   This shall consist of employees' total length of continuous service with the COMPANY.  From the date of hire through the first 9 months worked by employees within the bargaining unit after successful completion of their first Training Review Board or similar leadership review shall be a probationary period.  At the end of such probationary period the employees' plant-wide seniority date shall be the date they were hired.  Probationary employees shall be represented by the UNION in matters concerning wages, hours and working conditions, except as otherwise specified in this contract.

(b) Operating Department Seniority.  This shall consist of an employee's total length of continuous service in any and all operating jobs within a given operating department as set forth in Exhibit D of this contract.

**Section 3.  Seniority Lists**

The COMPANY will compile and electronically post, every six months a list showing the Operating Department seniority of all employees in the department.  A copy of each list will be *electronically* mailed to the UNION business office at least three times per year.

The COMPANY will compile and electronically furnish to the UNION once each calendar year a list showing the Operator Craft Seniority of all employees in the bargaining unit.

**Section 4.  When Seniority Does Not Apply or is Not Affected**

(a) Seniority privileges shall not apply to probationary employees, except as provided in Section 2 of this Article.

OLIN RESTRICTED - For internal use only
- 25 -

TRIM
COIL SAFETY ZONE

(b)  Seniority shall not serve as the sole basis for a choice of jobs in any one classification.

(c)  The Operator Craft seniority of an employee shall be lost when he/she is moved to and remains in a salaried classification for one year or is transferred to any other bargained-for group of employees for one year.

**Section 5.  When Seniority is Lost**

(a) Plant-wide Seniority: Plant-wide seniority shall be lost by employees as follows:

    (1)  When they are discharged;

    (2)  When they resign;

    (3)  When they are laid off and at such time have less than 18 months seniority and are not recalled for over 12 months;

    (4)  When they are laid off and at such time have from 18 months to 36 months seniority and are not recalled for over 18 months;

    (5)  When they are laid off and at such time have over 36 months seniority and are not recalled for over 24 months;

    (6)  When they do not reply to a recall letter within the time limit specified in Section 8 of this Article;

    (7)  When they do not return to work when recalled within the time limit specified in Section 8 of this Article;

    (8)  When they overstay a leave of absence;

    (9)  When they have less than 12 months seniority and are absent due to personal illness, unless they request and are granted an extension of time by the COMPANY, or an injury on the job for a period of time equal to the amount of seniority they had at the beginning of the absence, except that a minimum period of six months will apply;

    (10) When they have 12 months seniority or more and are absent due to personal illness for 12 months, unless they request and are granted an extension of time by the COMPANY;

    (11) When they have more than 12 months but less than 18 months seniority and are absent due to an injury on the job for 12 months;

    (12) When they have more than 18 months but less than 24 months seniority and are absent due to an injury on the job for 18 months;

    (13) When they have more than 24 months seniority and are absent due to an injury on the job for 24 months.

(b)   Operating Department Seniority.  Operating Department Seniority in a given Operating Department shall be lost by employees whenever their Plant-wide Seniority is lost, and also:

   (1)   When they are transferred out of the Operating Department;

   (2)   When they are laid off from the Operating Department for a period of time longer than that specified in Section 5, part (a), paragraphs (3) through (7) of this Article;

   (3)   When an employee elects to move to a salaried classification in Plant A or B and remains in such salaried classification for more than one year; or transfers to any other bargained-for group of employees for one year.

The COMPANY shall have the right to allow an employee to return or prohibit an employee from returning to the bargaining unit at any time during the one-year time period.

The employee who returns to his/her Operating Department per this language shall fill any vacancy.  If no vacancies exist the employee will be placed into any available position under the jurisdiction of the union currently occupied by a contractor employee and given plant bid rights.

**Section 6.  Consolidation or Splitting Departments**

When changes in plant operations are necessary, specific operating department structure (bid zones) may be split, combined, or modified by the COMPANY to align with business, technology, or function to address competitive benchmarking and meet business needs.  The COMPANY will provide written notification to the UNION, and request input from work team members prior to making a change. The COMPANY will provide employees a three month notice prior to splitting or combining bid lists.

When seniority lists are consolidated or modified into a single seniority list, the employees in the several departments will be placed on a single seniority list in order of their departmental seniority date in their old departments.  In case some employees on this new list then have the same departmental seniority date, they will be placed on the list in accordance with the tie breaking provision of Section 9 of this Article.  The operating jobs in the new department which retain their identity without question will initially continue to be filled by those employees who had been filling these jobs.  If one or more jobs are eliminated as a result of the consolidation such that the new department has a surplus of people, Section 7 of this Article will be applied on the basis of the new departmental seniority list.  If one or more new operating jobs are created as a result of the consolidation, the vacancies shall be filled as provided in Section 11 of this Article on the basis of the new department seniority list.

Whenever changes in plant operation make it necessary for the COMPANY to split one department into two or more new departments, each employee assigned to

OLIN RESTRICTED - For internal use only
- 27 -

the new departments from the old department will carry with him/her the departmental seniority date he/she had with the old department. The operating jobs in the new departments which can be identified without question as jobs formerly existing in the old department will initially be filled by employees who had been filling these jobs.

If there is some question as to whether a given job can be identified as one of the same jobs formerly existing, the department steward or stewards involved will be called in to help settle the question.

Changes made under this section will automatically amend Exhibit D of this contract as necessary and the COMPANY will notify the UNION regarding the necessary changes in Exhibit D.

**Section 7.  Layoffs**

(a)     Advanced Notice of Layoffs

The COMPANY agrees to give employees affected by a reduction in force, five working days' notice in advance of such layoff.

Employees being laid off who are away from their jobs at the time of this notice will be notified by telephone. If they cannot be reached in this manner, the layoff notices will be sent by certified mail to the last address on record with Human Resources, and this will constitute adequate notice of layoff.

Employees agree to give the COMPANY five working days' notice before quitting.

(b)     Layoffs from Department

(1)     All layoffs from a department shall be in inverse order of Operating Department Seniority, except in the case of employees disabled as a result of injury on the job. Such employees will be permitted to return to their job when able to, and to remain on the job regardless of seniority until they have recovered to the point where their disability no longer constitutes a          bar to other employment, or until such time as they are no longer capable of doing the work assigned.

Five working days' notice will be given to employees affected by such layoffs as well as to any employee whose job is eliminated.

(2)     Employees may decline to be reassigned and take their layoff out the gate and be recalled only to vacancies occurring in the department from which they were laid off. The three-year bid restriction shall not apply to employees assigned to any available position under the jurisdiction of the union currently occupied by a contractor employee as described in this Section.

The individual(s) whose job was actually eliminated as a result of the downsizing or reorganization, will be assigned into the open job(s) created by the least senior employee(s) leaving the department. If there is more than one impacted employee, the most senior employee may select which job he or she prefers.

(c)     Reduction in Operator Craft Group

    (1)  When it becomes necessary to make a reduction in force in the Operator Craft group, it will be made as follows:

        (a)  The employees with the least Operator Craft Seniority in the bargaining unit will be laid off.

        (b)  Vacancies in Operation jobs resulting from (b)(1) above will, if filled, be filled as outlined in Section 11 of this article.

        (c)  The movement of employees between departments as provided in this Article and in this section as a result of layoffs may be made simultaneously.

    (2)  Employees moved as provided in this section must be able to do the work assigned.

## Section 8.  Rehiring

Recalling into an Operating department shall be done on the basis of the Operating Department Seniority of those employees on the COMPANY'S payroll.

Recalling from outside the plant shall be done on the basis of Operator Craft Seniority.  Such employees being recalled shall be notified by certified mail, return receipt requested, mailed to the last address on record in the Human Resources files, with a copy of this recall letter sent to the UNION.  It is the responsibility of those laid off to keep Human Resources notified of their current address. Employees being recalled will lose their seniority when they, (a) fail to reply by certified mail, return receipt requested, within ten days after the mailing of the recall letter stating that they will return to work for the COMPANY, or (b) do not return to work for the COMPANY within ten days after having sent such a reply.  The COMPANY will then contact the next eligible employee.  In special cases, the time for reporting for work may be extended beyond the ten-day limit upon request when replying to the recall letter.

## Section 9.  Seniority Disputes

Disputes that arise over employees' proper places on the seniority lists will be settled as follows:

(a)  In case two or more employees were hired into the bargaining unit on the same day, their order on the Operator Craft Seniority list will be determined in the numerical order of their Social Security numbers, using all digits as one number.  Preference will be given to the employee with the lowest number.

(b)  When two or more employees are placed on Operator classification in a department listed in Exhibit D on the same day, they will be placed on the Operating Department Seniority list in the same order as they appear on the Operator Craft Seniority list.

### Section 10.  Temporary Assignments

Employees in an Operating Department in which operations are partly or completely curtailed for a temporary period may be assigned to work in other departments where work is available.  This will be done in inverse order of seniority unless it would cost additional training for the department.  Employees so assigned shall neither lose seniority in their own department nor gain seniority in the department to which they are temporarily assigned and if they choose not to work on the job to which they are temporarily assigned, they will be excused from work for the temporary period during which their jobs are not in operation and will return to work when their job is ready to start up.  "Temporary period," as used in this section, means for not longer than 150 days at a time.  No cut in pay will be involved, and the provisions of Section 7 of this Article, or Article IV, Section 4, concerning the various time periods available to or required by either party, shall not apply.

### Section 11.  Filling Vacancies or New Jobs

When a job opening or reorganization involving any job classification occurs, internal or external to a department, the process leader will assign individuals to specific jobs based on an assessment of the following: seniority, skills, ability, performance, individual interest, experience, and input from work team members.  The use of Seven Criteria will not be arbitrary or capricious and a standardized process will be implemented across the site.  Accordingly, the "Seven Criteria" assessment process will be used in the selection process to help identify and differentiate the aforementioned criteria among multiple job candidates. This standardized selection process will be implemented across the site.

When vacancies occur due to attrition (retirements, resignations, etc.) or creation of a new job, the opening will be filled through an internal posting.  If the filling of the job internally results in an additional opening, the plant leader has the option to fill the opening through an internal posting or site-wide posting. If the job is not filled internally a site-wide bid will be posted.  Employees from the department may post on the site-wide bid if they meet the requirements per this section.  Operators will be eligible to "bid" to job openings provided:

1.  The individual has fulfilled the minimum time commitment to the current department of three (3) years after TRB, and

2.  The current department certified (TRB'd) Operator staffing level for each role/job exceeds 80% unless the department Minimum Staffing document dictates otherwise.  If the Leader and the department steward cannot agree on a Minimum Staffing document creation or changes it must be taken to the Labor Relations Committee.

OLIN RESTRICTED - For internal use only

- 30 -

3.  The individual must be current on all of his/her Site and Department required training, and

4.  If bidding from Site Logistics meet the requirements specified in Article XXXI.

If the site-wide posting was successful and it creates a new opening, the leader in the affected department will decide if the job will be posted internally or whether it will be filled by a qualified volunteer from Site Logistics.  If the filling of the job internally results in an additional opening, the plant leader has the option to fill the opening through an internal posting or fill the opening from Site Logistics.

5.  If an employee with a lower classification accepts the bid on a job with a higher classification (rate), after six weeks, the employee will receive the rate of pay for the higher classification.
      Exception:  If there is a greater than six-week duration from the date of the job offer to the job start date, and this is communicated to the employee prior to the employee accepting the new role, the six week start date will be the same as the agreed upon start date in the offer.

The following is applicable to all job postings and assignments:

- The COMPANY is not obligated to assign any person who is not qualified for a position.

- Upon being transferred to a new position as outlined in this section, unless otherwise agreed to by the COMPANY, the employee will not be eligible to bid on a job internally or externally for a period of three (3) years from the date the employee successfully completes the required Training Review Board or similar leadership review.

- Employees on an Operating Classification who are on personal or industrial sick leave will be allowed to be considered for transfer to one or more specific jobs in one or more specific departments when the illness or injury prevents the employees from ever performing their regular assigned duties within their present department.

- For communication of internal bids, job openings with job descriptions will be posted within a department to solicit interested employees.

- Site-wide postings for jobs to be filled under this section will be posted plant-wide for fourteen days.  The posting will list the Operating Department and give a brief description of the job.  Employees may become eligible for consideration for transfer to such jobs, commensurate with their qualifications, by responding to Human Resources with their name, employee number, a self-nomination form and the number of the job in which they are interested.

As it relates to internal movement, it is not the COMPANY'S intent to force an employee onto a job internal to their department, in which the employee has no interest; however, effective operation of the plant must remain the first priority in staffing.  Only as a last resort will an employee be forced onto a job internal to their department if no other acceptable candidate is available.  It is not the COMPANY'S

OLIN RESTRICTED - For internal use only

intent that an employee who is assigned to a job internal to their department because there were no other acceptable candidates be forced to stay on that job long term.  If, after a reasonable time, the employee wants to move off the job he/she has the grievance process available on an ongoing basis.

**Section 12.  Staffing of New Plant/Significant Plant Expansions**

The COMPANY shall have the right to select individuals to staff up to 25% of a New Plant or Significant Plant Expansion and not follow the normal bidding process. Significant Plant Expansion shall be deemed to occur as the result of an expansion where 5 or more additional Operators are required to operate the plant. Candidates for these roles can come from current employees, employees who the COMPANY may transfer in from other Olin locations, or those hired from the outside.

Further, all Operators shall be required to remain in their positions for at least 5 years unless otherwise agreed to by the plant leader.

ARTICLE XVIII
**Grievance Procedure**

It is agreed that any employee or group of employees may, individually or through their representative, present complaints to the COMPANY.

It is agreed that all such complaints must arise out of the terms or interpretation of any express provision of this Agreement and any complaints regarding verbal or written discipline, suspensions or terminations will be addressed in the time structure as outlined in this Article unless otherwise mutually agreed upon in writing.

**Step 1.**  The parties should attempt to resolve the complaint themselves and utilize the available resources to do so.  For example, the Steward or Leader should be consulted.

**Step 2.**  A complaint which cannot be settled in Step 1 should be carried to the employee's steward.  If in the opinion of the steward the complaint is a just one, the employee and the steward should confer with the aggrieved employee's Leader in an attempt to reach an equitable adjustment.  If no agreement is reached then it will be judged a grievance and reduced to writing, setting forth all available facts, evidence and must reference the specific provision(s) of the contract which is alleged to have been violated or the details regarding verbal or written discipline, suspension, or termination.  The grievance shall be written, dated, and signed by the aggrieved employee or the steward or a union official on behalf of the aggrieved employee and forwarded to Labor Relations at which point the Company and Union's grievance panels will hear the grievance and the company will give an answer within calendar 14 days.

**Step 3.**  The parties hereby agree that both committees shall have the power to adjust any grievance as hereinbefore defined.  The representatives of the UNION shall be a committee designated by the UNION and shall consist of The UNION Business Manager or their designate and the Site Chief Stewards or their

TRIM
COIL SAFETY ZONE

designates. The representatives of the COMPANY shall be those persons designated as such by the COMPANY management and shall consist of the Site Labor Relations Manager and Production Leaders or their designates. The COMPANY Committee will provide grievance responses to the UNION within 14 days of the hearing unless an extension is mutually agreed upon by the UNION.

All conferences between the COMPANY and the UNION shall be held during daily working hours, and the employees attending such meetings shall receive their regular rate of pay for any time lost. No grievance will be considered if not presented within 30 days from the date the grievance occurred. It is the COMPANY'S intent to administer discipline and conduct investigations which could lead to discipline in an expedient manner. It is further agreed that the Grievance Committee shall meet to dispose of any case submitted to it. Labor Relations will put the grievance on the agenda for the next available regularly scheduled grievance hearing meeting, which will be scheduled at least twice a month. The grievances will be heard as soon as practicable, provided however, the COMPANY must hear a minimum of 5 grievances per month in the order they are received unless key participants are not available or otherwise agreed between both parties. The COMPANY will schedule termination grievances first. The Grievance Committee shall render a decision on the grievance within two weeks thereafter, unless otherwise agreed upon in writing.

ARTICLE XIX
**Arbitration Procedure**

It is further agreed that if the Grievance Committee cannot mutually settle any grievances that arise regarding employment terminations of non-probationary employees, or interpretations of this Agreement, the UNION may within 30 days from the grievance decision request to arbitrate such grievance. Upon receiving a timely filed valid request, the COMPANY and the UNION shall request the Federal Mediation and Conciliation Service to provide the names of five persons all of whom shall be impartial persons qualified to act as arbitrators. The impartial arbitrator will be chosen from this list by the representatives of the UNION and the COMPANY by a method mutually acceptable to both parties.
If no other method is acceptable, each party will alternately strike one name from the list until one name is left. The party striking the first name will be determined by lot.

The arbitrator in no way shall be permitted to add to, subtract from, or modify in any way the terms of this Agreement or have any authority in making of a new Agreement. He/She shall have no authority over wage rates established by this Agreement.

It is also agreed that the case will be presented to the impartial arbitrator on the earliest possible date and his/her decision will be final and binding upon both parties to this Agreement. The Arbitrator's decision shall be within the scope and terms of this Agreement and shall not change any of its terms or conditions. The Arbitrator shall in his/her decision specify whether or not the decision is retroactive or the effective date thereof. An extension of time will not be granted unless mutually agreed to by the parties to this Agreement.

OLIN RESTRICTED - For internal use only

Each party will bear the expenses of its witnesses.  The expenses of the arbitration not borne by the Federal Mediation and Conciliation Service shall be borne by and divided equally between the UNION and the COMPANY.

The UNION and the COMPANY agree to request the arbitrator hearing the case to render a decision within 30 days after the hearing if no briefs are filed.  In the event briefs are filed, within 30 days upon receipt of same.

ARTICLE XX
**Clothing on Certain Jobs**

The COMPANY agrees to furnish appropriate protective clothing on jobs where personal clothing would be destroyed or soiled to the extent that home laundry is not feasible in spite of precautions taken to protect the clothes.

ARTICLE XXI
**No Strikes or Lockouts**

**Section 1.**

The UNION agrees that it will do everything within its power to cause the employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the COMPANY and that neither its representatives nor its members will intimidate or coerce employees in any manner any time.

**Section 2.**

There shall be no strikes or stoppages of work by the UNION or lockouts by the COMPANY, so long as this Agreement is in effect.

**Section 3.**

The Company will put forth a good faith effort in conjunction with having discussions with the union to provide bargained for employees safe and separate access to their respective work sites as Olin employees.

**Section 4.**

The UNION, in making this Agreement is merely acting as agent for the employees covered by this Agreement and shall, under no circumstances, be liable for any strike, breach or other default under the Agreement, unless it can be shown that the UNION has caused or instigated such strike or other breach.

In the event of any employee or employees stopping work without approval of the UNION, such employee or employees will be subject to disciplinary action including discharge.

TRIM
COIL SAFETY ZONE

ARTICLE XXII
**Sick Leave**

The following plan is designed to provide benefits for time lost due to personal illness or injuries sustained on the job.  It is the responsibility of employees absent from work due to such illness or injury to carefully follow the instructions of their physician and do nothing which might impede their progress or postpone their return to work.  During such absence the employees will not travel from the immediate area without the written permission of their physician.  Employees will file such permission with Occupational Health Services and notify their supervision before they leave.  It is also the responsibility of the absent employees to keep their supervision informed of their condition and any change in their sick leave status.  The COMPANY reserves the right to request examination and make inquiries deemed advisable.  Any employee who abuses the privileges provided in this Article or who submits a claim for benefits based on false statements will be subject to disciplinary action including discharge.

In order to minimize the abuse of sick leave benefits under this plan, the UNION pledges its active support of and assistance to the COMPANY'S efforts to prevent abuse of the program and support any absenteeism guidelines for Texas Operations. The provisions of Article XII, Physical Examinations, are applicable to all Sick Leave under Section 1 and Section 2.

**Section 1.  Personal Illness, Family Illness, and Short-Term Disability**

This section covers benefits for time lost by employees due to personal illness or injury and family illness.  In the event of a long-term illness, employees will typically receive full benefits and pay at the straight-time hourly rate for a period up to six months* until Long-Term Disability becomes applicable.  The COMPANY will work with the employee to allow the employee to apply for Long-Term Disability benefits.  In no event shall employees receive more than 6 months of pay for any illness unless agreed to in writing by the COMPANY's Labor Relations Department.

**Personal/Family Illness**

All regular full-time employees will receive a combined 40 hours of personal/family illness per year.

New hires will receive a pro-rated amount of personal/family illness time based on the number of months they will work that year.  If the employee starts before the 15th of the month, that month will count in the accrual calculation.  If the employee starts on the 15th of the month or later, that month will not count in the accrual calculation.

Unused personal/family illness time will not be carried over to the next year.

If personal/family illness time is exhausted, personal choice time or vacation time will be used in its place before unpaid time off will be allowed.

Personal/family illness time may be used for an employee's personal illness, well care and medical/dental appointments.  Personal/family illness time also may be

used for illness and well care of a member of an employee's immediate family (this applies to the employee's spouse, children, and mother/father.)

For employees that are absent and have applied for FMLA or short-term disability, the required elimination period should first be covered by personal/family illness. If that is exhausted, the employee should use vacation or personal choice time. If all time-off banks are exhausted, then the remaining portion of the required elimination period will be unpaid.

Personal/family illness time must be taken in a minimum of one-hour increments.

Employees are not paid for unused personal/family illness time upon termination of employment.

**Short Term Disability**

**\*** Employees hired after ratification of this contract will fall under the following:

| YOS | Short Term Disability Available |
|---|---|
| Less than 1 year | 1 week (40 hours) |
| Over 1 year but less than 2 years | 2 weeks (80 hours) |
| Over 2 years but less than 3 years | 4 weeks (160 hours) |
| 3 years and over | up to six months |

Employees with over 1 year of service but less than 3 years of service may be allowed to use up to three months of short-term disability for serious medical issues approved from the employee's Medical Physician, Olin Medical Department, and Labor Relations.

Olin provides a Long-Term Disability 60% income protection plan, at no charge, to employees who have completed one year of continuous full-time service while actively at work. An additional 16.7% of coverage is available at employee cost. Refer to the Long-Term Disability Summary Plan Description.

Employees may use up to the equivalent of one (1) regularly scheduled work week (up to 40 hours) of their PI/FI time for attending to the illness or injury of immediate family members (spouse or children) per year. Personal Illness Sick Leave and Family Sick Leave above may be granted in one-hour increments.

None of the provisions of this section will apply for any sickness or injury:

(a)  resulting from employees' willful intention to injure themselves;

(b)  resulting from employees working for wages or being in business for themselves;

(c)  for which the employee has not been under the continuous care of a physician;

(d)  while the employee is absent because of a layoff, strike, or a 30-day or longer leave of absence; or

OLIN RESTRICTED - For internal use only
- 36 -

(e)  resulting from the employee's willful engagement in criminal activity.

Absences from work due to treatment or surgery that are cosmetic in nature or for the primary purpose of affecting sterility or fertility that are not the result of an illness or injury will not be covered by this Article.  Should complications result from such treatment or surgery that may cause an absence from work beyond the normally expected absence from same, then the case should be referred to Occupational Health Services and after conferring with the attending physician, they will make a determination as to what portion of the absence was due to the complication and therefore will be covered under the provisions of this Article.

**Section 2. Industrial Sick Leave**

This section covers income benefits for time lost by employees due to industrial injuries or sicknesses covered by the state workers' compensation laws.  The COMPANY will compensate the employee in an amount, when combined with any workers' compensation income benefits, equal to the employee's after-tax daily straight time base rate.  This additional income benefit will be limited to a lifetime maximum of 52 weeks unless otherwise agreed to by Labor Relations.

The provisions of this section will apply only when:

(a)  the illness or injury is determined to be compensable under the Texas Workers' Compensation Insurance Law, and

(b)  the employee is complying satisfactorily with the instructions of the physician in charge of his/her case.

**FMLA**

If an employee is on an approved leave under the Family and Medical Leave Act (FMLA) unpaid leave is only an option after vacation, personal/family illness, and personal choice time has been exhausted.

**Paid Parental Leave**

After 6 months of employment, employees may be eligible for a maximum of 160 hours of paid parental leave per birth, adoption, or placement of a child/children for adoption or foster care event (multiple child situations constitute a single event.)  In no case will an employee receive more than 160 hours of paid parental leave in a rolling 12-month period, regardless of whether more than one birth, adoption or foster care placement event occurs within that 12-month time frame.

Each week of paid parental leave is compensated at 100% of the employee's regular, straight-time weekly pay.  Payments will be made in accordance with the employee's regular pay schedule.

Approved paid parental leave may be taken at any time during the six-month period immediately following the birth, adoption, or placement of a child with the employee.  The time must be taken in one continuous period of leave.

OLIN RESTRICTED - For internal use only

Any unused paid parental leave will be forfeited at the end of the six-month time frame.

Should the individual's employment at the company cease, they will not be paid for any unused paid parental leave for which they were eligible for.

**Paid Parental Leave Additional Rules**:
- Runs concurrently with leave under the FMLA and state family and medical leave laws (such as the CFRA) and the leave will be counted toward the 12 weeks of available FMLA leave per a 12-month period.
- Paid parental leave taken under this policy will run concurrently with any other relevant state or local leave taken following the birth, placement, or adoption of a child, where applicable.
- An employee who takes paid parental leave that does not qualify for FMLA leave will be afforded the same level of job protection for the period of time that the employee is on paid parental leave as if they employee were on an FMLA qualifying leave.
- If the employee wishes to extend the leave period after the paid parental leave (and any short-term disability leave for employees giving birth) is exhausted, the employee may request to do so using vacation, personal/family illness time, personal choice time before using unpaid leave.
- The company will maintain all benefits for employees during the paid parental leave period just as if they were taking any other company paid leave such as paid vacation leave or paid sick leave.
- Holidays do not extend the total parental leave entitlement – these hours will count as hours used toward the approved leave.
- If this benefit is increased in any way during the period of this agreement, the Company agrees to meet and bargain with the Union over the increase.

**Requests for Paid Parental Leave**

The employee will file a claim for Paid Parental Leave through Olin's third-party administrator.  Where the need for leave is foreseeable, an employee should provide at least 30 days' written notice.  Where the need for leave is unforeseeable, an employee should provide written notice as soon as practicable.  The employee should contact leaveadministration@olin.com to begin the process.

For purposes of confirming eligibility for paid parental leave, the employee must submit appropriate documentation of birth, placement and/or adoption.

ARTICLE XXIII
**Dues Check-off**

The COMPANY agrees to honor check-off forms signed by individual employees in the presence of one witness on forms furnished by the COMPANY which authorize the COMPANY to deduct from the employee's first paycheck each month the regular monthly dues of the employee.  If the check-off authorization calls for deduction of a stated amount for initiation fees, such initiation fees will be deducted in a maximum of five installments, provided that no deduction is less than five dollars ($5.00).

TRIM
COIL SAFETY ZONE

However, not more than one such series of deductions will be made for any individual employee during the term of this contract.  The first installment will be deducted from the paycheck issued the week following receipt of the authorization form.  Such check-off authorization forms will be filled out in duplicate and a copy furnished to the UNION.  This will be done only in strict compliance with the applicable State and Federal laws.  If an employee does not receive a paycheck on the first day of a given month, the amount that should have been deducted that month will be added to the amount deducted the following month.

The check-off forms to be used will be as follows:

Payroll Dept
Human Resources                          _____
                                                        Employee Name (PRINT)

 Gentlemen:                                       _____
                                                        Employee Number

I, the undersigned employee, hereby assign from any wages earned or to be earned by me as your employee, to Local 564, IUOE, a sum of $ 5.00 for Initiation Fee, and  a sum of **1.5 times my hourly wage plus any increases of Per capita tax** as monthly Union Membership Dues.

I hereby authorize the COMPANY to make these deductions and to remit same to the Financial Secretary of the above-mentioned UNION.

I understand that if the membership of Local 564 changes the amount of the regular monthly dues, in accordance with Constitution and By-laws of the Union,
then this assignment shall be deemed as authorization and assignment for deduction of said regular monthly dues as so changed.

This assignment and authorization shall become effective as of the date it is received by the COMPANY and shall be irrevocable for the period of one year or until the termination of the current collective bargaining agreement between the COMPANY and the UNION, whichever occurs earlier; and this assignment and authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective bargaining agreement between the COMPANY and the UNION, whichever shall be the shorter, unless written notice is given by me, by registered US Mail, to the COMPANY and UNION during the ten day period immediately prior to the expiration of each period of one year, or during the 60 day period immediately prior to the expiration of each applicable collective bargaining agreement, whichever occurs earlier.  If is understood, however, that this agreement shall continue in force under its terms only so long as I perform work falling under the jurisdiction of the above UNION.

_____          _____
Signature of EMPLOYEE                                        Witness

_____          _____
Date Signed                                          Date Received by the Company

OLIN RESTRICTED - For internal use only

Dues check-off authorization cards signed under prior contracts shall remain in effect in accordance with the terms of the contract in effect at the time the employee signed the card.

Money deducted from pay checks as authorized herein for employees bargained for by the UNION will be forwarded by check to the address furnished the COMPANY by the UNION not later than the 20th day of the month in which the money is deducted, along with a summary sheet showing the name of each employee from whose pay checks dues and/or initiation fees were deducted and the amount deducted.

### ARTICLE XXIV
### Maintenance of Membership

It is agreed that if changes occur in existing laws so as to permit a Maintenance of Membership provision to be included in this contract at a future date, then at that time and in full compliance with the then existing laws, the parties shall meet and negotiate concerning the terms of a Maintenance of Membership provision.

### ARTICLE XXV
### Classifications and Wages

**Section 1.  Wage Structure**

For the duration of this Agreement, the job classifications and wage rates set forth in Exhibit A, and the minimum pension guarantees set forth in Exhibit C, are satisfactory to the parties hereto.

**Section 2.  Wage Increase**

The wage increase for the employees for 2023 through 2027 shall be effective at 7:00 a.m. on the dates indicated in Exhibit A.

**Section 3.  Potential Wage Freeze**

If the COMPANY initiates a COMPANY-wide annual wage freeze, that wage freeze would be applicable to bargained-for employees as well.  In such event all wage increases will be postponed by one year.

**Section 4.  Pay Progression**

Pay Progression for newly hired employees will be 36 months with increases in wages occurring every 12 months (see Exhibit A).

**Section 5.  Process Board Operator Rate**

The UNION acknowledges that it is the COMPANY's management right to decide on a plant-by-plant basis which roles are Board Operator roles and whether to have separate or combined Board Operator and Outside Operator roles (i.e., do both or rotating) within the Process Operator Classification, and the number of such roles

in each plant.  The Operator Rate will maintain a $2.00 per hour pay differentiation from the Process Operator rate.

## ARTICLE XXVI
### Miscellaneous Pay Practices

### Section 1.  Pay for Travel

An employee traveling on Olin business, with Leader approval, will be paid portal to portal.  Job related travel during an employee's normal work schedule will be counted as time worked.  If an employee is required to stay overnight, they will be paid for their normal work hours only.  When traveling, if they are required to perform job like duties on hours other than their normal work schedule, they will be paid.  If an employee elects to travel on a non-scheduled workday, travel time is not paid.

### Section 2.  Pay for Remote Off-hour Troubleshooting

Employees will be paid at the appropriate rate for time spent to resolve or troubleshoot problems during off-hours via telephone when the time involved is 8 minutes or more.  Call-out minimums do not apply.

### Section 3.  Mandatory Shower Pay

Employees, that are required by Occupational Health Services, as a part of their job to take a shower prior to leaving the plant will be compensated for 10 minutes.

### Section 4.  Community Outreach

Employees will be paid when participating in community activities at Olin's Public Affairs request. The employee must obtain Leader and Labor Relations approval, following the Public Affairs guidelines, in advance to be compensated for time away from work.  Employees will be compensated only for Community Outreach time that occurs during regular work schedule.

## ARTICLE XXVII
### Savings Clause

Should any part hereof or any provision herein contained be rendered or declared invalid by reason of any existing or subsequently enacted legislation or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions hereof, and they shall remain in full force and effect.

## ARTICLE XXVIII
### Department Side Agreement

The 90 days immediately prior to the expiration of the current bargaining Agreement will be used by the Department Leader and the department stewards to update or amend departmental side agreements pertaining to overtime distribution and lines of progression.  If, during such 90-day period, no agreement

is reached, the departmental differences will be settled during the negotiations of the new bargaining Agreement.

## ARTICLE XXIX
### No Discrimination

The COMPANY agrees that there will be no interference, intimidation, coercion, or discrimination in any manner against any person employed by the COMPANY because of participation in the activities of the UNION or because of race, age, creed, color, sex, national origin, disability, or veteran's status.

The UNION agrees that there will be no interference, intimidation, coercion, or discrimination in any manner against any person employed by the COMPANY because of race, age, creed, color, sex, national origin, disability, or veteran's status.

Both parties recognize their obligations under the Americans with Disabilities Act ("ADA") and agree to comply with the requirements of the statute. To the extent reasonable accommodation of a qualified employee with a disability requires a move, transfer, or change inconsistent with the terms of this Agreement, both parties agree to negotiate a mutually satisfactory resolution consistent with the requirements of the ADA and this Agreement.

The use of any male noun or pronoun in this Agreement is used in a neutral sense and is applied equally to both males and females.

## ARTICLE XXX
### Site Logistics

The COMPANY reserves the right to assign Distribution Operators in any job opening in that classification within the Site Logistics department as well as move them between businesses within the department to meet business needs.

### Site Logistics Structure

- Probationary Period is 12 months after first TRB.
- Pay Progression is **24** months.
- Process Operators cannot be laid off to Site Logistics.
- Process Operators can bid to Site Logistics per the site bidding process.
- Site Logistics minimum time to bid out to process is **16** months and meet site logistics bidding criteria **(PT degree, etc.).**
- **Site Logistics minimum time to bid out to Cell Services is 16 months**.
- Experienced hires will follow the site process for equivalent pay.
- **Employees will be able to bid to Process Operator after 3 years in Olin Site Logistics.**

Tier 1:
- Progression starts with hire date.
- 6 months
- Stage Gate review to Tier 1A

- Initial Start Level and Wage Rate

Tier 1A:
- 6 months
- Pass Stage Gate to Tier 2

Tier 2:
- 12 months
- Pass Stage Gate to Classification 3

Tier 3:
- Top Out

Tier 4:
- Bid into role
- Limited Number of Roles
- Can bid to Process Operator with Site Qualifications (i.e. PT degree, etc.), after been in Tier 4 role for 2 years

## ARTICLE XXXI
### Cell Services

Cell maintenance (M-83 & membrane) activities will be performed by the Cell Services Operator.  The COMPANY will maintain a minimum of eight full-time Olin Cell Services operators and those employees will be paid as per the Cell Rebuild Operator classification in Exhibit A.  The Cell Services and repair work will fall under the existing Contracting of Work language and also be responsible for solvent wash, cell gasketing, and cell repairs.

Cell Services Operators wishing to move to other operator jobs will be required to meet all requirements in this Agreement pertaining to those jobs.

Cell Services Operators will perform other tasks when not involved in cell work. This will include miscellaneous process operational work including cell helper, weekly inspections, unloading, environmental waste packaging, waste storage, inspections, housekeeping, etc.  Cell helper work will be at the direction of a Chlorine Production Process Operator. If the Process Operator, covering the cells, is off and the helper is qualified to independently perform the task he or she will be paid at the Process Operator rate of pay and not be eligible for pay upgrade at any other time while assisting Chlorine Production Process Operators.

Cell Services Operators may be assigned to perform work at other Olin locations. The Union agrees that a separate contract is not created when such employees are assigned non-bargained for work and further agrees not to claim jurisdiction over work or jobs assigned to Union employees that have been historically outside the jurisdiction of the Union.   Cell Services Operators may be assigned to work with salaried cell rebuild personnel.

Cell Services employees will be able to bid to process after 3 years in Cell Rebuild.

ARTICLE XXXII
**Discipline**

The COMPANY, for just cause, has the right to discipline and discharge; require employees to comply with COMPANY policies, rules, procedures, regulations and practices; to require interactive cooperation with other employees and to refrain from engaging in any type of insubordination or misconduct.  Progressive discipline will be used for non-significant offenses.

Severe violations which may result in termination without progressive discipline include but are not limited to violations of the Respect and Responsibility policy and the Minimum Standards of Conduct.

The UNION reserves the right to represent the employees coming under the jurisdiction of the UNION in all stages of discipline in compliance with the provisions of this contract.

ARTICLE XXXIII
**Training Initiative**

**Intent of this Article:**

Train and maintain knowledge to increase the competitiveness of Operators in a positive and safe manner.  Ensure that all Operators are given the opportunities and assistance in achieving the desired training.

**Section 1.  Departmental Training**

This will include the specific material and/or exercises for the specific plant processes, plant operating procedures, plant safety procedures, and for the specific tasks or duties that are relevant to the role or jobs for which the employee is being trained.

The Company will define required skills testing for employees, above and beyond hiring requirements.  These will be defined and administered within Department Training or Annual Training Requirements.   All personnel will be required to successfully complete the departmental training and tests for the job.  If questions arise regarding relevancy to the job and/or the degree of difficulty, the department steward may appeal such questions to the Site Labor Relations Department.

**Section 2.  Annual Training Requirements**

Annual training/testing will be treated similar to the process used in initial Training Review Board and will stay within the appropriate I.P.T. or training modules.  A reasonable test of the job requirements will be given.  If questions arise regarding relevancy to the job and/or the degree of difficulty, the department steward may appeal such questions to the Site Labor Relations Department.

The COMPANY will determine the training requirements for each job and may change those requirements from time to time.

## ARTICLE XXXIV
## Texas Operations Work Flexibility

The COMPANY and UNION agree to provide a work environment where job flexibility among bargained for employees is utilized to improve the competitiveness of Texas Operations. Among other productivity gains from implementing work flexibility, it is anticipated such flexibility will improve competitiveness, efficiency, and minimize contractors and non-bargained for employees.

## ARTICLE XXXV
## Severance Packages

The Company may choose to offer separation packages to an impacted work group when a work group is affected by downsizing or closure activities. Packages will be offered by plant-wide seniority on a volunteer basis. Number of packages being offered will be determined by the Company. Details of the packages will be negotiated with the Union.

## ARTICLE XXXVI
## Industrial Park (I-Park)

The Company may, from time to time, restructure its business operations by the sale of assets, through a joint venture, by allowing a third party to construct assets on the site, or similar transaction. In the event of such transaction, the Company has the right to identify bargaining unit employees of the Company that may be eligible for an offer of employment by a new employer ("Newco"). Those identified employees that receive an offer of employment from Newco and that do not accept such offer will be considered a voluntary quit and not permitted to exercise their seniority to bump/displace another bargaining unit employee or a contractor.

In addition, the Company may assign employees in the bargaining unit, on a temporary basis without regard to seniority, to provide training or other services provided by the bargaining unit to the owner(s) of such assets including their employees and contractors. Such training or other services may be assigned and provided at Company or Newco facilities.

The Company agrees to pay to bargaining unit employees that accept employment with Newco a lump sum payment representing the difference during the first year of employment with Newco in the dollar value of benefits offered by Company as of the date of transfer and the benefits provided by Newco. Benefits specifically excluded from this one year calculation are pension, retiree medical and retiree life. [The lump calculation will be made after the Union and Newco reach agreement on a new CBA and payment of the lump sum will then be made at the end of the year following the calculation being completed.]

If Newco discontinues operations at the Freeport site and releases former Olin employees within 2 years of the commencement of such operations, the

OLIN RESTRICTED - For internal use only
- 45 -

impacted former Olin employees will be considered for re-hire by Company prior to the Company posting externally for similar open positions.  This will be honored for one year after the former Olin employees are released by Newco. Re-hiring shall be done based on the use of the Seven Criteria in the selection process.  Such former Olin employees shall be notified by certified mail, return receipt requested, mailed to the last address on record in the Human Resources files, with a copy of this letter sent to the UNION.  It is the responsibility of those eligible former Olin employees to keep Human Resources notified of their current address.  Such former Olin employees will be deleted from the eligible list when they, (a) fail to reply by certified mail, return receipt requested, within ten days after the mailing of the letter or (b) fail to show up at the scheduled interview, or (c) the candidate is deemed not fit for rehire by the COMPANY.

## ARTICLE XXXVII
### Hurricane Pay

In the event of a Hurricane, employees who are released per the Texas Operations Hurricane Policy, will be guaranteed a maximum of five (5) days of their regularly scheduled straight time pay occurring as the result of the formal declaration by site leadership that the site is moving to hurricane status, and will cease when site leadership declares the termination of hurricane status.  This will include any extreme weather or operating circumstance, as declared by site leadership. Employees that do not return at time requested by management within (24) hours of the request, will not receive such pay. Employee must follow other applicable requirements, not leave until released, etc.

## ARTICLE XXXVIII
### CONTRACTING OF WORK

Janitor, and seasonal jobs, may be filled by contractor employees as bargaining unit employees leave and create vacancies.  The COMPANY may use contractor employees on Yard, Utility Work, Crane and Equipment Operator jobs.

Any bargaining unit work, including that mentioned above, may be assigned to contractor employees for part of a work day and part of a workweek.  Further, such work may be assigned to contractor employees for full workweeks for periods of time of less than a permanent nature.  The purpose of such assignments as mentioned in this paragraph will be to supplement and/or fill non-permanent vacancies left by the regular, full-time bargaining unit employees performing the same or similar work.

The COMPANY agrees that the work within the jurisdiction of the UNION being performed by contractor employees shall serve as a cushion in the event there is a reduction in force in the bargaining unit.  In this event, the COMPANY will replace contractor employees on such work where it makes sense economically and to the extent that each bargaining unit employee is physically able to perform the work of the displaced contractor employee.

This agreement will be effective for the duration of the current bargaining agreement and is made in conjunction with and subsequent to the current bargaining agreement.

OLIN RESTRICTED - For internal use only

- 46 -

**WORK STOPPAGE TRAINING**

The UNION acknowledges that the current jurisdiction clause language does not in any way prohibit the COMPANY from training salaried employees to perform bargained-for work in emergency situations including a potential work stoppage.

ARTICLE XXXIX
**Duration**

This basic Agreement shall become effective as upon ratification and shall continue in effect to 4:00 p.m., May 21, 2028, The COMPANY agrees not to file an RM petition with the National Labor Relations Board during the term of this contract. Either party may on or before March 22, 2028, give notice to the other party of the desire of the party giving such notice to negotiate with respect to the terms and conditions of a new basic Agreement.  If such notice is given, the parties shall meet at an agreeable time to negotiate the provisions of the new basic Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the 5th day of February 2023.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 564:

FOR THE COMPANY:

Charlie Singletary
Business Manager
     Company Spokesperson

James Myers

Herschel Riddle
Committee Member
     Company Committee

Jen Steinmiller

Lewis Crawford

Committee Member
     Company Committee

Matthew Neff

Kyle Cummins
Committee Member
     Company Committee

Aaron Roberts

Colby Singletary
Committee Member
     Company Committee

Tim Garza

     Company Committee

Adam Sinick

     Company Committee

Meaghan Connelly

OLIN RESTRICTED - For internal use only

TRIM
COIL SAFETY ZONE

**EXHIBIT A**

The following schedule of wage rates shall be made effective at 7:00 a.m. on the Monday of the first full pay period in the month of May of the respective year beginning in May 2023.

**Wages - Process Operators in Progression**

| STEP | Wage Increase Amount — DESCRIPTION | Current Wage | 2.9% 2023 | 3.0% 2024 | 3.1% 2025 | 3.2% 2026 | 3.5% 2027 |
|---|---|---|---|---|---|---|---|
| 24 | 0-12 MOS Process Operator | $32.30 | $33.24 | $34.23 | $35.30 | $36.42 | $37.70 |
| 86 | 0-12 MOS PO Board | $34.30 | $35.24 | $36.23 | $37.30 | $38.42 | $39.70 |
| | | | | | | | |
| 25 | 12-24 MOS Process Operator | $36.07 | $37.12 | $38.23 | $39.41 | $40.68 | $42.10 |
| 87 | 12-24 MOS PO Board | $38.07 | $39.12 | $40.23 | $41.41 | $42.68 | $44.10 |
| | | | | | | | |
| 66 | 24-36 MOS Process Operator | $40.63 | $41.81 | $43.06 | $44.40 | $45.82 | $47.42 |
| 67 | 24-36 MOS PO Board | $42.63 | $43.81 | $45.06 | $46.40 | $47.82 | $49.42 |

**Wages - Process Operators**

| STEP | Wage Increase Amount — DESCRIPTION | Current Wage | 2.9% 2023 | 3.0% 2024 | 3.1% 2025 | 3.2% 2026 | 3.5% 2027 |
|---|---|---|---|---|---|---|---|
| 97 | LAB OPERATOR | $41.33 | $42.53 | $43.80 | $45.16 | $46.61 | $48.24 |
| 46 | LAB OPER TRAINING | $39.33 | $40.53 | $41.80 | $43.16 | $44.61 | $48.24 |
| 45 | CELL REBUILD OPER | $36.01 | $37.05 | $38.17 | $39.35 | $40.61 | $42.03 |
| 83 | PO BOARD | $44.35 | $45.58 | $46.89 | $48.28 | $49.76 | $51.43 |
| 84 | PO BOARD TRAINING | $42.35 | $43.58 | $44.89 | $46.28 | $47.76 | $49.43 |
| 93 | PROCESS OPERATOR | $42.35 | $43.58 | $44.89 | $46.28 | $47.76 | $49.43 |
| 94 | PROCESS OPER TRNG | $40.35 | $41.58 | $42.89 | $44.28 | $45.76 | $47.43 |

OLIN RESTRICTED – For internal use only

| Distribution Operators | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wage Increase Amount | | | 2.9% | 3.0% | 3.1% | 3.2% | 3.5% |
| STEP | DESCRIPTION | Current Wage | 2023 | 2024 | 2025 | 2026 | 2027 |
| 47 | Tier 1 | $23.93 | $24.62 | $25.36 | $26.15 | $26.99 | $27.93 |
| 48 | Tier 1A | $25.93 | $26.68 | $27.48 | $28.33 | $29.24 | $30.26 |
| 49 | Tier 2 | $27.10 | $27.89 | $28.72 | $29.61 | $30.56 | $31.63 |
| 51 | Tier 3 | $31.76 | $32.68 | $33.66 | $34.70 | $35.82 | $37.07 |
| 52 | Tier 4 | $36.20 | $38.28 | $39.43 | $40.65 | $41.95 | $43.42 |

OLIN RESTRICTED - For internal use only
- 50 -

Trim Box Size: 5.5 x 8.5 in

**EXHIBIT B**
**PLANT DEFINITIONS**

When the term "Plant A" is used in this contract, it refers to the plant which was known, prior to February 8, 1947, as Texas Division, The Dow Chemical Company, Freeport, Texas.  Where the term "Plant B" is used in this contract, it refers to the plants which were known, prior to February 8, 1947, as Styrene Division, The Dow Chemical Company, Velasco, Texas, and Dow Magnesium Corporation, Velasco, Texas.

**EXHIBIT C**

**PENSION**

The company will include bargained for employees in the Olin Corporation Contributing Employee Ownership Plan (CEOP).  All current new hire employees will receive a 5% contribution of eligible compensation to the plan.  Any employees that joined as part of Blue Cube Operations on October 5, 2015 will remain on their current plan through December 31, 2017 (the comparability period).  On January 1, 2018, all employees will move the following contribution schedule.

- Employees who are age 45 and older are eligible to receive a Company Retirement Contribution of 7.5% of eligible compensation.
- Employees who are younger than age 45 are eligible to receive a Company Retirement Contribution of 5.0% of eligible compensation.
    - The contribution rate changes the month following the employee's attainment of age 45.

The Olin 401K portion of the CEOP will be matched based on base pay, plus all regularly scheduled overtime. Bargained for employees will have access to their benefits at workstations.

**BENEFITS**

Current benefits available to the Union shall be made available to the employees covered by this agreement.  However, the Company reserves the right to alter or modify these programs in order to maintain alignment with salaried benefit plans. Prior to a decision to modify these programs, the Company will meet with the Union to discuss possible changes and the rationale behind those changes.  Any proposal by the Union during these discussions will be considered by the Company.  Employee healthcare coverage cost will remain at 30% (employee) and 70%(company) for the life of the current contract. The Company shall provide the Union upon request relevant information needed to make reasonable proposal to any changes that may occur.

**EXHIBIT D**

**OPERATING DEPARTMENTS**

Listed below are the various departments in which Operating Department Seniority applied as of November 13, 2015.  Changes resulting from consolidating or splitting of departments will also be made as necessary.

| | |
|---|---|
| Analytical Ops Freeport | Chlorine 5 Operations |
| B23 El Operations | EDC/NPA Production |
| B68 Epoxy Intermediates | Epoxy II Operations |
| CA Chlorine 7 Operations | Epoxy One Production) |
| CAA L&D Operations | |
| Marine | Epoxy TICA LER/LEN |
| CMP | Freeport Energy Hourly Opns |
| Chlor-Alkali Cell Svcs Fpt | Site Logistics |
| Chlorine 3 Hourly | Trichlorethylene Operations |
| Chlorine 4 Hourly | |

**EXHIBIT E**
**AWARD PROGRAMS**

**Section 1.  Recognition Program**

Employees shall be entitled to the identical Recognition program as salaried employees.  All terms and conditions of the COMPANY's recognition program shall apply including non-payment terms and the COMPANY shall have the right to modify the program in any manner from time to time.  The COMPANY has no obligation to award an annual minimum aggregate amount to employees.

**Section 2.  Performance Award Program**

Employees shall be entitled to the identical annual performance award program as Freeport salaried employees except that the 1X (target) payout is 4% and the 2X (maximum) payout is 8% of annual base pay.  All terms and conditions of the COMPANY's annual performance award program shall apply including non-payout terms due to individual and COMPANY performance.  The COMPANY shall have the right to modify the program in any manner from time to time.  Notwithstanding any provision contained in the contract to the contrary this decision may not be grieved.

Department Leaders will determine individual variable pay (PA) following completion of the annual performance management process.

